UNITED STATES of America, Appellee,

v.

Royal W. HADFIELD, Jr.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Helen HADFIELD,
Defendant, Appellant.

Nos. 89–2169, 89–2170.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1990.

Decided Oct. 31, 1990.

---

Michael P. Ascher, Springfield, Mass., for defendant, appellant Royal W. Hadfield, Jr.

Vincent A. Bongiorni, Springfield, Mass., for defendant, appellant Helen Hadfield.

Dina Michael Chaitowitz, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for U.S.

Before SELYA, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

SELYA, Circuit Judge.

Appellants Royal W. Hadfield, Jr. and Helen Hadfield, husband and wife, were found guilty of narcotics and firearms violations in the United States District Court for the District of Massachusetts. They challenge their convictions on three grounds: (1) the district court's refusal to conduct an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), in respect to an affidavit supporting the first of two search warrants employed by the authorities; (2) certain evidentiary rulings at trial; and (3) sufficiency of the evidence. Finding no reversible error, we affirm.

## I. BACKGROUND

In order to place appellants' initiatives into proper perspective, it is necessary to limn what transpired below.

### A. *Pretrial Phase.*

Prior to trial, appellants moved to suppress marijuana, firearms, and other evidence seized during the search of their premises, or in the alternative, for a *Franks* hearing at which they might adduce evidence in support of suppression. These motions were initially assigned for argument before a United States magistrate who made certain factual findings summarized below.

On January 1, 1988, Edmund S. Cook, appellants' neighbor, complained to the Deerfield, Massachusetts police department that appellants' son, Christian Hadfield, had discharged a firearm illegally.[1] A similar complaint had been made by Joan Cook, Edmund's wife, in late 1987. In response, officer Burniske, accompanied by a state trooper, interviewed the Cooks at their home. The officers were informed that Christian Hadfield had discharged a long-barrelled rifle within roughly 200 feet of the Cooks' dwelling. The officers then went to appellants' residence and questioned Christian. He admitted doing the shooting but denied doing so within 500 feet of the Cooks' abode. Burniske did not ask to see the weapon.

Later that day, Deerfield police officer Newton reviewed Burniske's written report, decided that more spadework was required, went to the Cooks' home, and took written and oral statements from both spouses. The husband's written statement described the firearm wielded by Christian Hadfield as "a light caliber rifle (light report and long barrel) equipped with scope and leather sling." The wife was unable to describe the weapon in any detail, but stated that upward of 20 shots were fired. The Cooks' son, Ed, drew a diagram of the locus on which he characterized the firearm as a "rifle (22 caliber or B–B gun)."

On January 2, Newton prepared a search warrant application at the district attorney's office. Assistant district attorney Ross reviewed and approved the warrant request and accompanying affidavit. Officer Newton immediately presented the papers to a state magistrate, Johnson, who declined to issue a warrant. Little daunted, Newton and Ross reapplied on January 6. They supplemented the original affidavit with additional facts concerning Edmund Cook's observations of Christian

---

1. A Massachusetts statute criminalizes the discharge of a firearm, rifle, or shotgun within 500 feet of a dwelling. Mass.Gen.L. ch. 269, § 12E (Supp.1990).

Hadfield on January 1 and his familiarity with rifles. They successfully presented the revised materials to Judge Cross of the state superior court, who issued a warrant (the "firearms warrant") allowing the constables to reconnoiter the Hadfield residence, garage, and barn for long-barrelled rifles or any records indicating ownership or possession of such firearms.

At approximately 5:00 p.m. on January 6, close to a dozen local and state police officers executed the warrant. Among this gaggle of gendarmes were several who specialized in narcotics investigations. The lawmen encountered Christian Hadfield almost immediately upon entering the premises but did not show him the warrant; they asked instead where his father could be found. Upon learning that Royal Hadfield was in the barn, a state trooper went there. Once inside, he saw vast amounts of marijuana being processed. Based on what was seen in plain view, the authorities procured a second warrant (the "narcotics warrant") permitting a search of appellants' property for marijuana, drug paraphernalia, and the like. Upon executing the narcotics warrant, the officers struck paydirt. They seized a bevy of incriminating items, including large amounts of marijuana and a virtual arsenal of firearms. Royal Hadfield was arrested on the spot. Helen Hadfield, who was elsewhere during the search, was arrested the following day.

The bare record offered room for a suggestion that Newton and Ross might have misled Judge Cross when applying for the firearms warrant. The application form required that the affiant check one of two boxes to indicate whether the application had been previously submitted. Although an "X" appeared on a copy of the application signed by Judge Cross (in the box signifying that the same application had been presented once before), this "X" was in a different typeface than the remainder of the application. Moreover, no such mark appeared on the copy of the form which was appended to the application for the narcotics warrant. Troubled by these inconsistencies, the federal magistrate concluded that the application for the firearms warrant more likely than not had been doctored. He found in effect that officer Newton had left the box pristine in order to lead Judge Cross to think that the submission had not previously been rejected and altered the application (by inserting the "X") once the warrant issued in order to prevent discovery of his sleight of hand.

The federal magistrate made other findings inimical to the government's position. He concluded that Newton did not forthrightly disclose Ed Cook's uncertainty regarding whether Christian Hadfield fired a B–B gun or .22 caliber rifle.[2] To be precise, although the younger Cook's diagram (which divulged this information) was attached to, and referenced in, Newton's affidavit, the affidavit itself never explicitly noted the uncertainty. In a related vein, the magistrate wondered whether the elder Cook might have had doubts about the kind of gun used in light of his description of the weapon as one having a "light report" and his failure to register any express disagreement with Ed's equivocal comment.

Based upon these findings, the magistrate recommended that appellants' motion for a *Franks* hearing be allowed. The government objected, setting the stage for *de novo* review at the district court level. *See* 28 U.S.C. § 636(b)(1)(C). In support of its objection, the prosecution introduced new evidence to clarify the record and refute some of the inferences drawn by the magistrate. The district court was persuaded; it sustained the government's objection and denied the requested hearing. In reaching this decision, the court accepted most of the federal magistrate's subsidiary findings but made the following additional findings, based largely on the neoteric evidence.

---

**2.** The magistrate believed that the firing of a B–B gun within the statutorily proscribed radius, as opposed to a .22 caliber rifle, would not have constituted a violation of Mass.Gen.L. ch. 269, § 12E. *Cf. Commonwealth v. Rhodes*, 389 Mass. 641, 644, 451 N.E.2d 1151, 1154 (1983) (carriage of B–B gun does not transgress Mass. Gen.L. ch. 269, § 10). It is not necessary for us to decide this unsettled state-law question.

When Magistrate Johnson originally declined to issue the firearms warrant, he informed officer Newton of three key difficulties. (1) The affidavit did not contain sufficient information about Edmund Cook's familiarity with guns. (2) Cook's son had been noncommittal as to whether the weapon was a .22 caliber rifle or a B–B gun. (3) There was room to doubt Newton's motives, as the real reason for the firearms search might well have been to find drugs. To meet these criticisms, Newton reinterviewed the Cooks, focusing on Johnson's stated concerns, and thereafter fleshed out his affidavit. Newton added *inter alia* that Edmund Cook was extremely knowledgeable about weapons; that Cook was certain Christian Hadfield fired a rifle on January 1, not a B–B gun; and that Cook had signed complaints against Royal Hadfield in the past for discharging weapons within 500 feet of a dwelling, one of which led to a criminal conviction.

The district court also credited newly emergent statements by Newton and Ross that they recalled discussing the prior (failed) application with Judge Cross when presenting the redrafted application. Both remembered telling Judge Cross the specific reasons for Magistrate Johnson's refusal to issue the warrant and describing their efforts to remedy those deficiencies. The district court noted that these averments were consistent with Newton's earlier testimony at Christian Hadfield's state court suppression hearing, during which Newton told of informing Judge Cross that the initial application had been denied. In light of this credited testimony, the district court concluded that the issue of when the "X" was placed on the renewed warrant application was irrelevant inasmuch as Judge Cross was verbally apprised of the previous application.

## B. *Trial Phase.*

At trial, the prosecution argued in effect that the defendants were partners in a flourishing marijuana business. The evidence showed that the real estate owned jointly by Mr. and Mrs. Hadfield featured a barn, a garage, and a dwelling. The buildings were at the end of a dirt road, invisible from the public highway. Warning signs adorned the rim of the property: one read "Beware of Dog," while the other, located under two floodlights, stated: "This house guarded by shotgun three nights per week. You guess which three."

Inside the barn, the officers saw 27 drying marijuana plants hanging from the first-floor ceiling. In an unlocked room immediately to the right of the front door, a semiautomatic pistol was found in a secret compartment of a tool box. Two large chests held 52 mason jars filled with marijuana buds and four containers of marijuana. Poised over these chests was a gun rack containing three firearms: a loaded Savage .22 caliber rifle with the initials RWH carved into the stock, an unloaded Browning rifle, and an unloaded shotgun. Between the front door and this room, the officers found a Stevens double-barrelled shotgun with two live rounds of ammunition next to it. A Remington rifle hung on the wall opposite this shotgun.

The police gained access to a locked room in the barn with a key taken from Royal Hadfield. The room yielded six containers filled with marijuana, four revolvers, and two bags of ammunition. Hidden beneath the floorboards, the officers uncovered seven bricks of marijuana weighing 8.9 pounds each and a mason jar containing $2,840 in cash.[3] On the second floor of the barn, the officers found 55 mature marijuana plants and a packaging area. The marijuana plants were in pots, covered with foil paper, and situated in a room filled with heaters, humidifiers, and halide growlights. The packaging area also contained scales, plastic bags, mason jars, a device for sealing plastic bags, a wood press used to make bricks of marijuana (actually containing a compressed brick of the substance at the moment of discovery), and a Tupperware vat filled with 16 plastic bags of marijuana. In the garage, the officers discovered 207 marijuana plants in various stages of growth. These plants were in rooms covered with foil and filled with the

**3.** The evidence showed that the street value of each brick was over $28,000.

**992**

same sort of cultivation equipment as was in the barn.

After searching the house, the officers seized, among other things, two photographs of Helen Hadfield surrounded by marijuana, a marijuana grower's handbook, sundry jars and vials filled with marijuana and/or marijuana seeds, seven more firearms, ammunition, and sundry drug paraphernalia. When Helen Hadfield was arrested, she had on her person a hardware-store invoice for a special order of ten cases of mason jars, a package of rolling papers, and a picture of her husband with a double-barrelled shotgun.

At trial, the government adduced testimony as to the efficacy with which the Stevens double-barrelled shotgun and the Savage rifle could be used and how swiftly a person standing by the trap door (under which the bricks of marijuana and cash were secreted) could load the shotgun with buckshot and aim it toward the front door. The government also introduced two prior convictions pursuant to Fed.R.Evid. 404(b): Royal Hadfield's 1983 conviction for trafficking in marijuana and Helen Hadfield's 1983 conviction for possession of marijuana with intent to distribute.

The jury found defendants guilty of possession with intent to distribute 100 or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); 18 U.S.C. § 2. Royal Hadfield was also found guilty of using firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1) and being a person in possession of firearms, although prohibited from possessing them, in violation of 18 U.S.C. § 922(g). The Hadfield property was subjected to forfeiture because it had been used to facilitate a drug trafficking crime in contravention of 21 U.S.C. § 853(a)(2).

With this overview of pretrial and trial developments, we turn to appellants' several assignments of error.

## II. SUPPRESSION RULINGS

Appellants argue before us that the district court erred in denying their suppression motion without a *Franks* hearing. Of-

ficer Newton, they claim, intentionally or recklessly omitted from the affidavit supporting his application for the firearms warrant two critical facts: the same request had been earlier submitted to, and denied by, Magistrate Johnson, and uncertainty existed regarding the type of weapon fired by Christian Hadfield. They also assert that a hearing was needed to probe their contention that the issuance of the firearms warrant was itself a pretext for a narcotics-oriented search. We find these asseverations unconvincing.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, the Supreme Court held that a defendant was entitled to a hearing at which he could challenge the truthfulness of statements made in an affidavit supporting a search warrant if—and only if—the defendant made a substantial preliminary showing that (1) a statement in the affidavit was knowingly and intentionally false, or made with reckless disregard for the truth, and (2) the falsehood was necessary to the finding of probable cause. *Id.* at 155–56, 171–72, 98 S.Ct. at 2676–77, 2684–85; *see also United States v. Paradis*, 802 F.2d 553, 558 (1st Cir.1986). By the same token, the right to a *Franks* hearing can be triggered by an affidavit which suffers from a material omission. *See United States v. Parcels of Land*, 903 F.2d 36, 46 (1st Cir.1990).

"The test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?" *United States v. Panitz*, 907 F.2d 1267, 1273 (1st Cir.1990). That test applies in the *Franks* context. *See Franks*, 438 U.S. at 171, 98 S.Ct. at 2684 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine."). We review the district court's determination that the defendants failed to make this threshold showing only for clear error. *Parcels of Land*, 903 F.2d at 46.

### A. *Material Omissions.*

In this instance, we conclude that the denial of a *Franks* hearing based on

the application's contents was not clearly erroneous. The district court found that, despite the suggestion of connivance produced by the apparent *ex post* alteration of the cover sheet, Judge Cross knew of the prior attempt to obtain a warrant. Given the statements of Newton and Ross, this finding was sustainable. Notwithstanding the obviously self-serving nature . of the testimony, it was not clear error for the district court to accept the assurances, especially since they comported entirely with Newton's previous state court testimony and were not opposed by any conflicting evidence.

The alleged failure to highlight Ed Cook's lack of certitude strikes us as a herring of a rather rubicund hue. The fact that Newton, in the body of his affidavit, did not dwell on the younger Cook's rumination was not an omission because the diagram itself—the very source of the alleged uncertainty—was attached to the affidavit and expressly cross-referenced therein. The diagram was readily observable, not buried in a pile of superfluous appendices. For this reason, the court's finding that Newton had not omitted material information was solidly grounded.

Moreover, we hasten to add that, even if the absence of pinpointed discussion were to be construed as an omission, it could not be characterized as intentional. It would be arrant nonsense to argue that Newton, if he were trying to deceive Judge Cross, would nonetheless have attached the diagram to the affidavit. Nor could any such omission be characterized as reckless; the senior Cook's unequivocal statement, when reinterviewed, that the gun fired was a long-barrelled rifle, not a B–B gun, made it readily apparent that his son's doubts were unfounded.[4] Although it might have been better practice for the officer to have mentioned Ed Cook's lack of conviction in the affidavit proper, it was not materially misleading for him to handle the matter in a different manner.

**4.** It is noteworthy that while Cook's son observed Christian Hadfield through binoculars from an appreciable distance, Cook himself was less than 75 feet away when the shooting occurred.

### B. *Pretext.*

Appellants claim that an evidentiary hearing should have been convened to probe the question of whether the police used Cook's complaint of a firearms violation as a convenient excuse to enter the Hadfields' home and ransack it for evidence of drug offenses; the police, appellants say, were interested all along in narcotics rather than weaponry. This blast misses the mark by a wide margin.

The pretext claim was impuissant as a matter of law. In essence, the Hadfields argued before us that a *Franks* hearing was needed to examine the subjective intent of the officers in seeking the firearms warrant to "determin[e] whether material omissions from the warrant application were made deliberately or recklessly." Appellants' Brief at 25. To the extent that this claim of pretext is a reformulation of appellants' theory that Newton purposefully omitted material information from the warrant application submitted to Judge Cross, we have already exposed its frailties. *See supra* Part II(A). To the extent that the claim suggests that a court called upon to review the adequacy of a search warrant application should focus on subjective rather than objective criteria, it is wrongheaded. It is a bedrock premise of fourth amendment jurisprudence, that an officer's state of mind or subjective intent in conducting a search is inapposite as long as the circumstances, viewed objectively, justify the action taken. *See, e.g., Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989); *Michigan v. Chesternut,* 486 U.S. 567, 575 n. 7, 108 S.Ct. 1975, 1980 n. 7, 100 L.Ed.2d 565 (1988); *Scott v. United States,* 436 U.S. 128, 137–39, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). It cannot seriously be doubted that the facts, taken objectively, justified a search for firearms. The inquiry ends there.

### C. *Recapitulation.*

There is no point in flogging a pair of dead horses. The district court's determi-

nation that appellants failed to make the substantial preliminary showing necessary to engage the gears of *Franks v. Delaware* was not clearly erroneous. Appellants' attempt to bolster their case by questioning the officers' state of mind comes too late and comprises too little. For these reasons, the request for a *Franks* hearing was appropriately refused.

## III. EVIDENTIARY RULINGS

Appellants argue that the district court erred in admitting various pieces of evidence, claiming in each instance that the evidence's prejudicial effect overbalanced its probative value. We discern no reversible error.

### A. *Prior Crimes.*

■ The government introduced certified copies of the appellants' 1983 companion convictions for narcotics violations under the aegis of Fed.R.Evid. 404(b).[5] The test for employing Rule 404(b) is twofold. First, "extrinsic offense evidence, though inadmissible to show an individual's (evil) proclivities, may properly be used at trial if it has some special relevance in establishing a disputed material issue." *United States v. Ingraham*, 832 F.2d 229, 231 (1st Cir.1987), *cert. denied*, 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). In this case, neither defendant conceded intent to distribute the marijuana. Indeed, Helen Hadfield's main defense was grounded on the idea that she was a homemaker and floral shop employee who played no part in her husband's marijuana business. Accordingly, the convictions were probative of appellants' knowledge, their joint and several intent to distribute the drug, and their working relationship.

We have often upheld the admission of evidence of prior narcotics involvement in drug trafficking cases to prove knowledge and intent. *See, e.g., United States v. Ferrer–Cruz*, 899 F.2d 135, 138 (1st Cir.

1990) (introduction of prior convictions of drug trafficking admissible to prove defendant's knowledge that bags found in car contained cocaine); *United States v. Rubio–Estrada*, 857 F.2d 845, 850 (1st Cir. 1988) (introduction of prior drug trafficking conviction admissible to prove knowledge where defendant claimed he did not know that cocaine was in his house); *United States v. Molinares Charris*, 822 F.2d 1213, 1220 (1st Cir.1987) (prior involvement with drug smuggling tended to refute claim of mere presence on boat carrying drugs), *cert. denied*, —— U.S. ——, 110 S.Ct. 233, 107 L.Ed.2d 185 (1989). We have similarly upheld the admission of past convictions to prove a conspiracy or common scheme where the earlier crime involved the same participants as the charged crime. *See, e.g., United States v. Flores–Perez*, 849 F.2d 1, 7 (1st Cir.1988) (citing cases); *United States v. Andiarena*, 823 F.2d 673, 677 (1st Cir.1987); *cf. United States v. Fields*, 871 F.2d 188, 197–98 (1st Cir.) (discussing admissibility of evidence of subsequent crimes), *cert. denied*, —— U.S. ——, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989). Here, the past criminality was proximate in time and closely allied with the type of crimes for which appellants were being tried. In a nutshell, appellants' prior convictions were specially relevant.

The test's second prong implicates Fed. R.Evid. 403, which permits the exclusion of relevant evidence, including evidence possessing special relevance in the Rule 404(b) sense, if its probative value is "substantially outweighed" by the risk of prejudice. *See United States v. De La Cruz*, 902 F.2d 121, 123 (1st Cir.1990); *Ferrer–Cruz*, 899 F.2d at 137–38.

A district court's assessment regarding admissibility of evidence in the face of a Rule 403 challenge is reviewed under an abuse-of-discretion standard. *See United States v. Green*, 887 F.2d 25, 27 (1st Cir.

---

**5.** The Rule provides:

 **(b) Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for

other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b).

1989). We have repeatedly stated that such a battlefield determination is to be accorded great deference on appeal. *See, e.g., De La Cruz*, 902 F.2d at 124; *Green*, 887 F.2d at 27; *United States v. Foley*, 871 F.2d 235, 238 (1st Cir.1989); *Ingraham*, 832 F.2d at 233–34. "Only rarely—and in extraordinarily compelling circumstances— will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1340 (1st Cir.1988).

The district judge's decision to admit the Hadfields' prior narcotics convictions does not constitute one of the rare occasions warranting appellate intervention. For one thing, the probative value of the evidence was great; it bore heavily on a hotly disputed issue critical to guilt or innocence. For another thing, the trial court handled the evidence with consummate care. Before the convictions were introduced, the court gave a limiting instruction to ensure that this extrinsic act evidence would not be used to infer bad character. The court also gave a complete instruction on the permissible uses of Rule 404(b) evidence at the close of the case.

To be sure, the evidence was prejudicial—but not unduly so. *See Onujiogu v. United States*, 817 F.2d 3, 6 (1st Cir.1987) (all evidence is meant to be prejudicial; Rule 403 is designed to screen out only unfair prejudice). The court's decision to admit it cannot be faulted on appeal.[6]

### B. *The Photograph of Royal Hadfield.*

■ When the government offered a package of materials seized from Helen Hadfield's purse, its proffer included a picture of her husband holding a shotgun, taken in 1977. There was no objection to the introduction of this photograph. Accordingly, the picture's admission into evidence constitutes a ground for reversal only upon a showing of plain error. *See United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir.1989); *United States v. Rivera–Medina*, 845 F.2d 12, 17 (1st Cir.), *cert. denied*, 488 U.S. 862, 109 S.Ct. 160, 102 L.Ed.2d 131 (1988); *United States v. Griffin*, 818 F.2d 97, 99–100 (1st Cir.), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987); *see generally* Fed.R. Evid. 103. Plain error requires a demonstration that justice has miscarried or that the trial's basic fairness has been compromised. *See United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). As we have repeatedly warned: "The plain error hurdle is high." *Hunnewell*, 891 F.2d at 956. In this instance, it is insurmountable.

■ Realistically, the challenged photograph could not have inspired unfair prejudice against Royal Hadfield. The snapshot did not depict him involved in any illegal activity.[7] It was not used at trial to undermine a position advanced by Royal Hadfield, but was used in conjunction with other evidence to refute testimony that Helen Hadfield was afraid of guns. It strains credulity well past the breaking point to say that introduction of this picture infected Royal Hadfield's trial with so significant a degree of prejudice that a miscarriage of justice resulted. *Cf., e.g., United States v. Polito*, 856 F.2d 414, 419–20 (1st Cir.1988) (hearsay reference to prior cocaine trafficking, though improper, held harmless in context of entire record); *United States v. Vest*, 842 F.2d 1319, 1326 n. 4 (1st Cir.1987) (in the context of a lengthy trial, brief testimony relating to prior bad act did not corrode fundamental fairness), *cert. denied*, 488 U.S. 965, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988).

### C. *Photographs of Helen Hadfield.*

■ The appellants contend that the district court improperly admitted two of the

---

6. In view of our rejection of appellants' Rule 404(b) argument, we need not consider various alternative bases on which evidence of one or both of these convictions might have been premised.

7. Although Royal Hadfield was charged in this case with being in possession of firearms in violation of 18 U.S.C. § 922(g), his status as a prohibited person stemmed from his 1983 drug trafficking conviction, which postdated the picture by seven years.

10 photographs seized from the Hadfields' living room. One picture, taken in 1977, showed Helen Hadfield in a marijuana field; the other, taken sometime in the 1970s, depicted Helen Hadfield and other family members standing in front of a marijuana patch.

This assignment of error seemingly overlooks that the linchpin of Helen's defense was that her husband carried on a marijuana business without her participation, possibly without her knowledge. The pictures, despite their relative antiquity, arguably suggest that Helen knew full well that marijuana played an important part in the family business. They might also have tended to discredit her testimony that she ordered 10 cases of mason jars to can vegetables, not to package marijuana.[8] At any rate, while the probative worth of this evidence was slight, its prejudicial effect was negligible. Mrs. Hadfield, after all, was a co-owner of premises crammed with marijuana, firearms, drug paraphernalia, and the like, and lived there day after day. Even if the photographs might better have been excluded, their admission was harmless beyond a reasonable doubt.

## IV. SUFFICIENCY OF THE EVIDENCE

■ Appellants' argument that their convictions should be reversed because of insufficient evidence will not wash. At the outset, we remark that the sufficiency challenge is hamstrung by a self-inflicted procedural wound. While the appellants moved for judgments of acquittal under Fed.R.Crim.P. 29(a) at the close of the government's case, they failed to renew their motions after presenting evidence on their own behalf. Because such a failure constitutes a waiver of the earlier Rule 29 motions, we inquire into the challenged convictions only for clear and gross injustice. *United States v. Clotida,* 892 F.2d 1098, 1102–03 (1st Cir.1989); *United States*

v. *Paz Uribe,* 891 F.2d 396, 399 (1st Cir. 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990); *United States v. Jimenez–Perez,* 869 F.2d 9, 11 (1st Cir.1989). We see none here.

### A. *Royal Hadfield.*

■ Royal Hadfield's brief attacks adequacy of the evidence in respect to only one of the three counts on which he was convicted: the charged violation of 18 U.S.C. § 924(c)(1). Because he has not offered any developed argumentation anent the other counts, we will not delve into them. *See United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.) (issues not briefed are waived), *cert. denied,* —— U.S. ——, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990).

When a criminal defendant raises a question of evidentiary sufficiency in the aftermath of an adverse jury verdict, we must take the facts in the light most hospitable to the prosecution, drawing all reasonable inferences in its favor. *Jimenez–Perez,* 869 F.2d at 10; *Ingraham,* 832 F.2d at 230. Here the evidence, viewed in that manner, established that Royal Hadfield participated in running a large-scale marijuana operation. The family's premises harbored not only a substantial amount of the drug in various stages of harvest and in open view, but also large sums of cash, numerous jars of seed, drug paraphernalia, and assorted armaments. His conviction under 18 U.S.C. § 924(c)(1), however, required more: the statute mandates proof that the defendant used one or more firearms "during and in relation to" a drug trafficking offense.[9] We think the government met— and surpassed—this benchmark.

The indictment designated the Stevens double-barrelled shotgun and the Savage .22 caliber rifle as the weapons used in relation to the crime. The shotgun was located near the barn's entrance and the rifle was located in a gunrack in the room

---

8. We note that, in any event, the record is bereft of any physical evidence to bulwark Helen Hadfield's claim that she was an inveterate canner.

9. The statute of conviction provides in pertinent part:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

18 U.S.C. § 924(c)(1) (1988).

immediately to the right of the entrance. Although the shotgun was unloaded, it had two live rounds of buckshot lying next to it. The rifle had a live hollow-point bullet in its chamber. Relying principally on *United States v. Feliz–Cordero*, 859 F.2d 250 (2d Cir.1988), Hadfield urges that the evidence against him was too flimsy to warrant a guilty verdict. In our estimation, defendant uses the cited case much as an inebriate might use a lamppost—more for support than for illumination.

In *Feliz–Cordero*, the defendant lived in apartment 3 while his brother resided in apartment 5 in the same building. The brothers discussed a drug sale with an undercover agent in apartment 3, but the sale to the agent occurred in apartment 5. In a warrant-backed search of both apartments, the agents found cocaine, cocaine base, and drug paraphernalia in apartment 5 and a small quantity of cocaine, drug records, cash, a beeper, and a loaded pistol (in a dresser drawer in the bedroom) in apartment 3. *Id.* at 251–52. The court reversed the defendant's conviction for violating 18 U.S.C. § 924(c)(1), concluding that there was insufficient proof that he had positioned the weapon so as to have it available for ready use during a drug transaction. The panel articulated the following standard:

> [I]n order for possession of a firearm to come within the "uses" provision of section 924(c), one of the following is required: i) Proof of a transaction in which the circumstances surrounding the presence of a firearm suggest that the possessor of the firearm intended to have it available for possible use during the transaction; or ii) The circumstances surrounding the presence of a firearm in a place where drug transactions take place suggest that it was strategically located so as to be quickly and easily available during such a transaction.

*Feliz–Cordero*, 859 F.2d at 254. Appellants put a transactional spin on this passage, reading the language as demanding reversal of a section 924(c)(1) conviction unless the evidence shows a gun was kept immediately available in order to facilitate drug deals. But the statute's sweep is not so circumscribed. Indeed, the Second Circuit, progenitor of the *Feliz–Cordero* standard, has applied the rule more broadly.

Any suggestion of a transactional requirement was dispelled in *United States v. Meggett*, 875 F.2d 24 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 166, 107 L.Ed.2d 123 (1989), where the court upheld a conviction on the ground that five loaded firearms found in defendant's apartment served "to protect that apartment as a storage and processing point for large quantities of narcotics." *Id.* at 29. The fact that no drug transactions took place in the apartment was not enough to invalidate the conviction. By the same token, any suggestion of an "immediate availability" requirement was jettisoned in a pair of recent Second Circuit cases. In *United States v. Alvarado*, 882 F.2d 645 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1114, 107 L.Ed.2d 1021 (1989), the court upheld a section 924(c)(1) conviction even though two of the three guns found on the premises were locked in a safe, observing that "a reasonable jury could infer that the guns were located there to protect both the money and the cocaine in the event that a drug deal went sour and a buyer demanded a return of his cash." *Id.* at 654. In *United States v. Torres*, 901 F.2d 205 (2d Cir.1990), the court permitted a conviction to stand against a female defendant even though the gun was kept under a queen-size mattress: "Testimony that two men were required to lift the mattress which concealed the gun did not preclude the jury from finding that the gun would be available to a person who knew its location, without any need to lift the mattress." *Id.* at 218. All three of these opinions take pains to distinguish *Feliz–Cordero* and limit it to its own facts. *See id.* at 218–19; *Alvarado*, 882 F.2d at 653; *Meggett*, 875 F.2d at 29. Clearly, then, *Feliz–Cordero* does not assist Royal Hadfield.

Although this court has sustained convictions under section 924(c)(1) where defendants carried guns, undisplayed, during a drug transaction, *see, e.g., United States v. Eaton*, 890 F.2d 511 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1927, 109 L.Ed.2d

291 (1989); *United States v. Payero*, 888 F.2d 928 (1st Cir.1989),[10] we have yet to examine the sufficiency of evidence supporting a conviction under the statute where the weapon was not at the site of an anticipated transaction but was located at a storage or processing facility. We reject outright the appellants' alternative theses that guilt must turn upon whether drug deals are actually consummated on the premises or upon whether a weapon is kept in an immediately accessible position. Such elements, of course, have evidentiary significance, but they do not have controlling effect.

 In our judgment, the critical concern is the presence or absence of a facilitative nexus: in a so-called "drug fortress" case, where a firearm is found proximate to drugs, money, and related accouterments, the question is whether placement of the weapon was designed to facilitate the narcotics enterprise, by, say, protecting against untoward contingencies or safeguarding the cache of drugs. It is reasonable, we think, if an operable firearm is found in close proximity to a room or rooms in which drug distribution, processing, or storage occurs, for the factfinder to conclude that the defendant knew the gun was there and intended it to be available for use in connection with the predicate offense. Indeed, so long as one purpose in situating the weapon nearby was to protect the narcotics enterprise, that need not have been defendant's sole purpose. *See Payero*, 888 F.2d at 929. In sum, even if a firearm is not instantly available or exclusively dedicated to the narcotics trade, a sufficient nexus may exist to support a finding that it was "used" during and in relation to a drug trafficking crime.

Other circuits have reached similar conclusions. *See, e.g., United States v. Young-Bey*, 893 F.2d 178, 181 (8th Cir. 1989) (juries may "infer that firearms found among a drug trafficker's paraphernalia are used to further the drug venture and are thus used during and in relation to

drug trafficking within the meaning of section 924(c)"); *United States v. Boyd*, 885 F.2d 246, 250 (5th Cir.1989) ("It is enough that the firearm was present at the drug-trafficking scene, that the weapon could have been used to protect or facilitate the operation, and that the presence of the weapon was in some way connected with the drug trafficking"); *United States v. Acosta-Cazares*, 878 F.2d 945, 952 (6th Cir.) ("We hold that 'uses' and 'carries' [in § 924(c)(1) ] should be construed broadly to cover the gamut of situations where drug traffickers have ready access to weapons with which they secure or enforce their transactions"), *cert. denied,* — U.S. —, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989); *see also United States v. Lyman*, 892 F.2d 751, 754 (8th Cir.1989), *cert. denied,* — U.S. —, 111 S.Ct. 45, 112 L.Ed.2d 21 (1990).

The facts of this case do not test the limits of these holdings. Both the shotgun and the rifle were easily accessible and in close proximity to the barn's entrance and operational areas. The rifle was loaded with ammunition of a particularly lethal sort. The government presented evidence that the shotgun could quickly be loaded with nearby buckshot. Mr. Hadfield concedes that he knew the weapons were there. Moreover, the substantial value of the marijuana found on the premises had evidentiary force—the more precious the contraband, the more likely that a possessor would take heroic measures to defend it. The other weapons scattered throughout the premises, as well as the posted warnings, similarly lent credence to an inference that the two designated firearms were part and parcel of a protective array assembled to guard valuable merchandise. Based on this evidence, the jurors were well within the pale in finding that the shotgun and rifle were used "during and in relation to" Royal Hadfield's narcotics venture. It was no injustice at all—much less a clear and gross injustice—for Hadfield to be convicted of violating 18 U.S.C. § 924(c)(1).

---

**10.** Eaton stashed his weapon under the seat of the truck which he drove to the site of a narcotics transaction. *Eaton*, 890 F.2d at 512. Payero

had a gun tucked into the waistband of his trousers at a pivotal stage of an ongoing drug deal. *Payero*, 888 F.2d at 929.

## B. *Helen Hadfield.*

█ Although the question is closer, it is also true that the jury had before it sufficient evidence to convict Helen Hadfield of possessing 100 or more marijuana plants with intent to distribute them in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), 18 U.S.C. § 2. She was an owner/occupier of premises in which a booming marijuana enterprise was conducted in an open and notorious manner, obvious to all persons in residence. When arrested, she had on her person an invoice for 10 cases of specially ordered mason jars which, when considered in conjunction with the 52 mason jars already filled with marijuana buds, strongly suggested that she was not only aware of, but participated in, the enterprise. This inference was corroborated and strengthened by the photographs and the Rule 404(b) evidence. It was further bolstered by what the jury could have found to be a tall tale concerning defendant's sudden interest in canning. *See, e.g., Jimenez–Perez,* 869 F.2d at 11 (if jury disbelieved defendant's story, "it could legitimately have presumed that the fabrication was all the more proof of ... guilt"); *United States v. Quejada–Zurique,* 708 F.2d 857, 861 (1st Cir.) (similar), *cert. denied,* 464 U.S. 855, 104 S.Ct. 173, 78 L.Ed.2d 156 (1983).

To be sure, the government's case against Mrs. Hadfield was largely a circumstantial one. There was room for a jury to conclude, perhaps, that she was an innocent bystander, carried along on the rushing tide of her husband's criminality. Yet the jurors could equally as well have decided that the converging circumstances portended a more sinister involvement. *See, e.g., United States v. Glover,* 814 F.2d 15, 17 (1st Cir.1987) (defendant's knowledge of open drug activity in her home, combined with her possession of a key for the closet in which the money supply was locked, permitted the jury to draw inference of guilt). In the last analysis, this case falls comfortably within the confines of our frequently reiterated rule:

We have repeatedly stated, and today reaffirm, that in a criminal case, "the evidence need not preclude every reasonable hypothesis inconsistent with guilt" in order to sustain a conviction. *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985), *cert. denied,* 475 U.S. 1029 [106 S.Ct. 1233, 89 L.Ed.2d 342] (1986). It is enough that ... a rational jury could look objectively at the proof and supportably conclude beyond reasonable doubt that the defendant's guilt had been established.

*Ingraham,* 832 F.2d at 239–40. Measured by this yardstick, Helen Hadfield's conviction must stand. There was no clear and gross injustice.

## V. CONCLUSION

We need go no further. To the extent appellants have ventured other legal arguments, none require comment. From aught that careful perscrutation reveals, the evidence used to prosecute these defendants was lawfully gathered, their trial fairly conducted, and their convictions justly secured.

*Affirmed.*