USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1138 UNITED STATES, Appellee, v. EVERTON THOMPSON, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. A. David Mazzone, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Cyr and Stahl, Circuit Judges. ______________ _____________________ Owen S. Walker, Federal Defender Office, by Appointment of _______________ the Court, for appellant. Michael J. Pelgro, Assistant United States Attorney, ____________________ Organized Crime Drug Enforcement Task Force, with whom Donald K. _________ Stern, United States Attorney, was on brief for appellee. _____ ____________________ August 16, 1994 ____________________ TORRUELLA, Circuit Judge. A federal grand jury ______________ returned an eleven-count indictment which charged seven defendants, not including defendant/appellant Everton Thompson, with conspiracy to distribute cocaine base from September 1991 to June 1992, and other substantive drug distribution counts. Count Ten of the indictment charged Thompson, and three other defendants, with the knowing possession of a handgun with an obliterated serial number in violation of 18 U.S.C. 922(k). Thompson pled guilty to Count Ten. At the sentencing hearing, the court determined that the applicable guideline was U.S.S.G. 2K2.1 (1990), and found that Thompson "used or possessed the firearm in connection with the commission or attempted commission" of the drug offenses. The court therefore applied the cross-reference provision set forth in 2K2.1(c)(2) and imputed to Thompson a series of drug offenses committed by the alleged conspiracy. Thompson now challenges the district court's interpretation and application of U.S.S.G. 2K2.1(c)(2). We affirm. I. BACKGROUND I. BACKGROUND __________ A. Facts A. Facts We cull the facts from unobjected to portions of the Presentence Report ("PSR") and from the government's statement of evidence at the plea hearing. United States v. Garc a, 954 F.2d _____________ ______ 12, 14 (1st Cir. 1992). This case involves a 1991 Drug Enforcement Administration ("DEA") investigation of drug trafficking in -2- Dorchester, Massachusetts. Codefendant David Jackson was the leader of a group of persons who were running a cocaine and cocaine base distribution enterprise out of an apartment at 49 Theodore Street in Dorchester. During the investigation, the DEA utilized a confidential informant ("CI") who purchased large quantities of cocaine and cocaine base from various codefendants at 49 Theodore Street, engaged in negotiations with various codefendants to purchase a machine gun and other firearms, and purchased a handgun with an obliterated serial number. The evidence established the following facts linking Thompson to his codefendants. On August 15 and September 9, the CI made his first two cocaine purchases, totalling approximately 250 grams, from two men, one of whom was defendant Charles Brown. On September 24, 1991, Brown sold the CI 68 grams of cocaine base and 43 grams of cocaine. Brown told the CI that he might be able to get him a Tech-9 firearm for $1000 and would contact "the man with the guns." On September 25, 1991, the CI placed a drug order with Brown, and Brown mentioned that he was going to check about obtaining the gun. On October 2, 1991, Brown took the CI to the first floor apartment at 49 Theodore Street, where the CI observed drug transactions and other drug activity. Brown introduced the CI to Jackson, and told the CI that Jackson was the "boss." The CI paid Jackson $8,500 and was thereupon given 227 grams of cocaine base by defendant Roy Gray, who was also in the apartment. On October 3, 1991, the CI and Brown had a telephone -3- conversation in which they discussed the "crack" which the CI had purchased the day before, and the firearm Brown had mentioned. On October 6, 1991, the CI telephoned the Theodore Street apartment and spoke to a man named "Henry." The CI then told Henry to tell Brown to get a firearm for him. On October 9, 1991, the CI went to the Theodore Street apartment, but neither Brown nor Jackson was there. Brown then arrived at the apartment with Thompson, and Thompson told the CI that Jackson was not there, and asked the CI for his beeper number. Shortly thereafter, Jackson arrived. The CI asked Jackson if he could buy a quarter kilogram of crack and Jackson replied that it would be no problem. Jackson told the CI that he could get the CI anything he wanted and that he could get a 9 millimeter pistol for the CI immediately. Jackson stated that he had to have guns, and that all of his boys had guns. Jackson further informed the CI that a Jamaican soldier sold guns to him and was supposed to bring him a machine gun. Jackson told the CI that he would sell a Tech-9 (firearm) to the CI for $1000. Jackson asked the CI for his beeper number, and the CI told Jackson that he had given the number to Thompson. On October 11, 1991, Jackson, who presumably received the beeper number from Thompson, paged the CI. The CI telephoned Jackson, and Jackson said that he had to go somewhere and that the CI would have to deal with his brother, "Dean." Jackson said that he could get the CI any type of gun, and that he had spoken with his gun contact the previous night. Later that day, the CI -4- went to the Theodore Street apartment and bought 227 grams of crack from Dean for $8000. Thompson and Gray were present at the apartment, and the CI asked Gray about the firearm. Gray talked to Thompson, and Thompson stated that he did not know anything about it. That night, the CI spoke with Jackson, and Jackson told the CI that he could pick up the gun from defendant Michael Shields the following morning at Theodore Street. On October 12, 1991, the CI went to Theodore Street, where he met Shields. The CI told Shields that he was there to pick up a gun. Shields told the CI that he was going to make a call to Henry's house, so that Henry would bring the gun to the CI at Theodore Street. The CI then observed Shields make a telephone call. Shields handed the telephone to the CI and said that Jackson was on the phone. Jackson told the CI to wait a while until Shields woke up Henry who would get the gun for the CI. Shields then asked Thompson to take a cab to Henry's home, and to get the gun from him. Thompson left the apartment, and later returned with Henry. Henry handed the CI a 9 millimeter firearm with an obliterated serial number. Thompson handed Henry a box containing 50 rounds of ammunition and Henry gave the box of ammunition to the CI. During the following three or four weeks, the CI had more contact with the defendants at Theodore Street. On October 15, the CI went to Theodore Street. Thompson opened the kitchen door for him and led him to an adjacent room where the CI met with Jackson. The CI paid Jackson $650 for the handgun he had -5- previously purchased. While in the apartment, the CI observed Dean engage in a drug transaction involving what appeared to be cocaine. On October 18, the CI telephoned Theodore Street and Thompson answered the telephone. The CI then talked to Shields about a future crack cocaine transaction. On October 21, Thompson was present at Theodore Street when the CI arrived to purchase more crack. Shields and Henry arrived later to sell the CI the crack. Acting at the instruction of Shields, Henry left the apartment and returned with 223 grams of cocaine base, and sold it to the CI for $8000. The CI also had a discussion with Shields about purchasing machine guns. After early November 1991, there was less contact between the CI and the defendants. On November 5, Jackson paged the CI through his beeper. The CI then telephoned Jackson, at which point Jackson asked him when he was going to purchase more cocaine. Jackson informed the CI that his gun supplier was getting weapons and that the CI could purchase them when Jackson received them. On December 10, the CI went with Shields to the Theodore Street apartment and had a discussion with Jackson concerning future narcotics transactions. While there, the CI saw Thompson at the apartment. In early January 1992, the CI went to a second location, 973 Blue Hill Avenue in Boston, to purchase more cocaine base, and he spoke with Gray. After a -6- while, the CI went to the Theodore Street apartment, where he met with Thompson and Gray. The CI told Thompson that he was there to buy something from Jackson, and Thompson responded that the CI would have to deal directly with Jackson. B. Proceedings Below B. Proceedings Below On January 20, 1993, the grand jury returned an eleven- count indictment against eight defendants. The only count in ____ which Thompson was charged, Count Ten, alleged that on or about October 12, 1991, Jackson, Shields, "Henry," and Thompson knowingly possessed a 9-millimeter pistol with a removed, obliterated or altered serial number, in violation of 18 U.S.C. 922(k). The other counts, alleging a cocaine base distribution conspiracy, and substantive cocaine and cocaine base distribution charges, concerned conduct of the other defendants over a six- month period from late September 1991 through March 1992. Thompson pled guilty to Count Ten on October 20, 1993. Pursuant to a plea agreement, the government agreed to recommend a 30-month prison sentence. The agreement provided that if the court decided to sentence Thompson to more than 30 months, Thompson would be permitted to withdraw his guilty plea. The PSR was issued on December 15, 1993. The PSR recommended that the guideline applicable to the offense was U.S.S.G. 2K2.1, and that the 1990 guidelines applied, rather then the guidelines in effect when the report was prepared, because applying the latter version might create an ex post facto __ ____ _____ problem. Because the PSR determined that "defendant used or -7- possessed the firearm in connection with the commission or attempted commission" of the overall drug conspiracy, the PSR applied the "cross-reference" provision set forth in 2K2.1(c)(2) and imputed to Thompson a series of drug offenses committed by the alleged conspiracy in October 1991. Finding that the conspiracy was responsible for 122.5 grams of cocaine and 450.9 grams of cocaine base during that period, the PSR calculated Thompson's base offense level as 34. By making certain adjustments, it found Thompson's overall offense level to be 37, and Thompson's applicable criminal history category to be I. Since the applicable Sentencing Guideline range of 210-262 months was above the statutory maximum of 60 months, the latter figure became the Sentencing Guideline range pursuant to U.S.S.G. 5G1.1(a). Thompson agreed that the applicable offense-level guideline was U.S.S.G. 2K2.1 (1990), but objected to the PSR's conclusions that the 2K2.1(c)(2) cross-reference provision applied to him. The court sentenced Thompson on January 7, 1994. The court, agreeing with the PSR, found that the 2K2.1(c)(2) cross- reference provision applied and imputed to Thompson the drug offense level as computed in the PSR. Specifically, the court accepted the undisputed factual assertions contained in the PSR, which convinced the court by a preponderance of the evidence that there was a "sufficient basis" to find that "the weapon was used in connection with and/or to facilitate the commission of the -8- offense." The court specifically noted that all of the narcotics-related events occurred at the Theodore Street apartment and that Thompson's name came up in the PSR "in connection with others who were, indeed, involved in the substantive drug offenses and in the context in which Mr. Thompson could reasonably be held to have knowledge that they were so involved and he was so involved." The court determined that the applicable sentencing range was the statutory maximum of 60 months imprisonment. The court then departed downward to a prison sentence of thirty months, because it found that the cross-reference resulted in an "extraordinary enlargement of defendant's role and culpability," and the plea agreement "does not undermine the guidelines" and does not contravene the purposes of the sentences.1 II. ANALYSIS II. ANALYSIS ________ A. Standard of Review A. Standard of Review On appeal, Thompson challenges the district court's application of sentencing guideline 2K2.1(c)(2) (1990). When we review a district court's application of a sentencing guideline, we utilize a bifurcated process. First, we review the guideline's legal meaning and scope de novo. United States v. _______ _____________ Brewster, 1 F.3d 51, 54 (1st Cir. 1993) (citing United States v. ________ _____________ St. Cyr, 977 F.2d 698, 701 (1st Cir. 1992)). Next, we review the _______ court's factfinding for clear error, giving due deference to the ____________________ 1 Without the 2K2.1(c)(2) (1990) cross-reference provision, Thompson's guideline sentencing range would be 0-6 months. -9- court's application of the guidelines to the facts. 18 U.S.C. 3742(e); Brewster, 1 F.3d at 54 (citing St. Cyr, 977 F.2d at ________ ________ 701); see, e.g., United States v. Wheelwright, 918 F.2d 226, 227- ___ ____ _____________ ___________ 28 (1st Cir. 1990) (applying clearly erroneous standard when reviewing district court's application of U.S.S.G. 2K2.1(c)(1987) cross-reference provision). B. Principles of Statutory Construction - B. Principles of Statutory Construction - What does the Guideline Say and Mean? What does the Guideline Say and Mean? The sentencing guideline at issue, U.S.S.G. 2K2.1(c)(2) (1990), provides: If the defendant used or possessed the firearm in connection with commission or attempted commission of another offense, apply 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above. U.S.S.G. 2X1.1(a) (1990) in turn requires that the base offense level is to be determined from the guideline for the object offense, plus any adjustments from such guideline for any intended offense conduct that can be established within reasonable certainty. The question in this appeal is whether Thompson's constructive possession of the firearm was "in connection with" one or more of the drug offenses.2 This Circuit has not specifically identified what evidence is sufficient to sustain a ____________________ 2 Thompson pled guilty to Count Ten of the indictment which charged him with the knowing possession of a handgun with an obliterated serial number. Thompson does not, therefore, challenge the court's implicit determination at sentencing that he "used or possessed" the firearm pursuant to U.S.S.G. 2K2.1(c)(2). -10- finding under 2K2.1(c)(2) that a firearm was possessed in connection with the commission or attempted commission of another offense. Thompson argues that the phrase "in connection with" should be interpreted narrowly, in a way that requires a tight facilitative nexus between a defendant's possession of a firearm and the commission of any drug offense. Thompson contends that such a nexus is lacking in this case. The government argues that the phrase is to be interpreted broadly and that Thompson's conduct easily falls within the purview of the guideline. When interpreting a statute, it is axiomatic that a court must first look to the plain words and structure of the statute. United States v. O'Neil, 11 F.3d 292, 295 (1st Cir. _____________ ______ 1993); see also United States v. DeLuca, 17 F.3d 6, 10 (1st Cir. ________ _____________ ______ 1994) (stating that principles of statutory interpretation apply to sentencing guidelines). With respect to the sentencing guidelines, courts should strive to apply the guidelines as written, according words in common usage their ordinary meaning. Brewster, 1 F.3d at 54. Because the phrase "in connection with" ________ is not defined under U.S.S.G. 2K2, we assume that the Sentencing Commission did not intend the terms to have an exceptional or guideline-specific meaning. This reinforces our belief that the words should be accorded their customary meaning. See Smith v. United States, 113 S. Ct. 2050, 2054 (1993); ___ _____ ______________ Brewster, 1 F.3d at 54.3 ________ ____________________ 3 Thompson points to the language of the 2K2 cross-reference when originally issued, which provided: -11- Merriam-Webster's Collegiate Dictionary 245 (10th Ed. 1993) defines "connection" as a "causal or logical relation or sequence." This definition suggests that there must be some reasoned link between a defendant's possession of a firearm and the commission or attempted commission of another offense. While it is difficult to sketch the outer boundaries of this link, there is no question that where a defendant's possession of a firearm somehow aids or facilitates, or has the potential to aid or facilitate, the commission of another offense, the defendant's possession of the firearm is causally and logically related to the other offense. A defendant's possession of a firearm cannot therefore simply be coincidental. Courts which have interpreted the phrase "in connection ____________________ If the defendant used the firearm in committing or attempting another offense, apply the guideline in respect to such other offense, or 2X1.1 (Attempt of Conspiracy) if the resulting offense level is higher than that determined above. U.S.S.G. 2K2.1 (1987). Thompson argues that this earlier language required a tight nexus between the firearm and the cross-referenced offense. Although the wording of the cross-reference provision was changed between 1987 and 1990, Thompson argues that this modification was not intended to change the meaning of the cross-reference. (The phrase "[i]f the defendant used the firearm in committing or attempting another offense" was replaced by "[i]f the defendant used or possessed the firearm in connection with commission or attempted commission of another offense." U.S.S.G., App. C, Amendment 189 (1989)). To support this argument, Thompson contends that the lack of expository comment in relation to the amendment means that it is unlikely that the change in wording signalled a change in meaning or how it was to be applied. We do not agree. We do not believe we should use the absence of legislative history to interpret a statute or guideline in a manner inconsistent with its plain language. United States v. _____________ Zackular, 945 F.2d 423, 424 (1st Cir. 1991). ________ -12- with" in the context of 2K2 of the guidelines have adopted and applied this plain meaning. In Brewster, the First Circuit ________ reviewed the district court's application of the phrase "in connection with" in the context of U.S.S.G. 2K2.1(b)(5) (1992), a similar cross-reference provision.4 Id. at 54-55. In __ Brewster, over the course of a month, an undercover federal agent ________ met with Brewster several times to discuss the possibility of buying drugs and guns. Their discussions came to fruition when Brewster sold the agent a small amount of crack cocaine, and within an hour of that transaction, also sold him an automatic weapon. Brewster eventually pled guilty to charges of distribution of cocaine and being a felon in possession of a firearm. At the sentencing hearing, the agent testified that he had told Brewster from the outset that he aspired to be a drug dealer, and that he needed a weapon to facilitate his plan. Brewster denied that he knew of any link between the weapon and the agent's planned drug trafficking. The court then found that Brewster sold the firearm with knowledge of the buyer's intended narcotics-related use of the weapon, and enhanced his sentence pursuant to U.S.S.G. 2K2.1 (b)(5). Brewster then appealed the ____________________ 4 U.S.S.G. 2K2.1(b)(5) (1992) provides: If the defendant used or possessed any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent or reason to believe that it would be used or possessed in connection with another felony offense, increase by four levels. -13- court's application of this cross-reference. We determined that the phrase "in connection with" should be accorded its ordinary meaning. The court then noted that the case turned on credibility, and found that the district court's decision to credit the agent's recitation of events, which indicated that Brewster sold the gun with reason to believe that his customer planned to use the gun in connection with drug trafficking, was supported by the record, and that this constituted a sufficient nexus between the weapon and the drug trafficking, for purposes of the sentence enhancement. Id. at 54-55. See also United __ _________ ______ States v. Condren, 18 F.3d 1190, 1200 (5th Cir. 1994); United ______ _______ ______ States v. Sanders, 990 F.2d 582, 585 (10th Cir.), cert. denied, ______ _______ ____________ 114 S. Ct. 216 (1993). Our construction of the phrase "in connection with" comports with the Supreme Court's recent interpretation of an analogous phrase, "in relation to" in the context of 18 U.S.C. 924(c)(1). See Smith v. United States, 113 S. Ct. 2050, 2059 ___ _____ _____________ (1993); United States v. Routon, No. 93-10103, slip. op. (9th ______________ ______ Cir. June 1, 1994). In Smith, the Supreme Court looked to the _____ ordinary meaning of the phrase "in relation to" and found that it meant "with reference to" or "as regards." Smith, 113 S. Ct. at _____ 2058-59 (citing Webster's New International Dictionary of the English Language, at 2102). The Court emphasized that the phrase had an expansive meaning. Id. at 2058. The Court stated: __ The phrase "in relation to" thus, at a minimum, clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its -14- presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allays explicitly the concern that a person could be" punished under 924(c)(1) for committing a drug trafficking offense "while in possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime. United States _____________ v. Stewart, 779 F.2d 538, 539 (9th Cir. _______ 1985) (Kennedy, J.). Instead, the gun at least must "facilitate, or have the potential of facilitating," the drug trafficking offense. Smith, 113 S. Ct. at 2059 (other citations omitted.); United _____ ______ States v. Hadfield, 918 F.2d 987, 998 (1st Cir. 1990) (stating ______ ________ that under 18 U.S.C. 924(c), the critical concern is the presence or absence of a facilitative nexus between the firearm and drug activity, and finding that even if a firearm is not instantly available or exclusively dedicated to the narcotics trade, a sufficient nexus may exist to find a firearm was used during and in relation to a drug trafficking crime), cert. _____ denied, 500 U.S. 936 (1991). We therefore believe that the ______ phrase "in connection with" should be interpreted broadly and that where a defendant's possession of a firearm aids or facilitates the commission of another offense, the requisite link is present.5 ____________________ 5 Thompson points to the Tenth Circuit's opinion in United ______ States v. G mez-Arrellano, 5 F.3d 464 (10th Cir. 1993), which ______ _______________ expressly looked to 18 U.S.C. 924(c) for interpretative guidance, as controlling precedent. In United States v. Sanders, _____________ _______ 990 F.2d 582 (10th Cir.), cert. denied, 114 S. Ct. 216 (1993), an ____________ earlier Tenth Circuit case, the court refused to look to 18 U.S.C. 924(c) which creates criminal liability for one who uses or carries a firearm "during and in relation to any crime of violence or drug trafficking crime" as a guide for interpreting -15- We do not believe that the district court's factual finding that Thompson's constructive possession of the handgun facilitated the commission of the cocaine and cocaine base offenses, and therefore fell within the ambit of the 2K2.1(c)(2) cross-reference provision, was clearly erroneous. The record supports the conclusion that a drug distribution operation was run out of the Theodore Street apartment, and that ____________________ 2K2.1(b)(5) because the standard under 924(c) was "much higher than that necessary for enhancement under the Guidelines." Sanders, 990 F.2d at 585. After Sanders was decided, the United _______ _______ States Supreme Court issued its decision in Smith v. United _____ ______ States, 113 S. Ct. 2050, 2059-60 (1993), which interpreted 18 ______ U.S.C. 924(c) to require evidence showing only that a weapon facilitated or had the potential to facilitate a crime -- a lower standard than that previously used by the Tenth Circuit. In G mez-Arrellano, the Tenth Circuit expressly looked to 18 _______________ U.S.C. 924(c) for guidance as to how to interpret the phrase "in connection with" and ultimately held that the district court's decision to apply the sentence enhancement for use of a firearm in connection with another felony was unsupported by the record. The facts had shown that when INS officers went to arrest Mr. G mez-Arrellano at an Albuquerque residence, the officers observed a green leafy substance in plain view and Mr. G mez-Arrellano attempting to hide a plastic bag under a bed. A subsequent search of the residence led to the discovery of marijuana, cocaine, a pistol and ammunition. Because there was no evidence in the record regarding the physical proximity between the weapon and the drugs, nor any evidence regarding the size or layout of the house, nor any indication that drug transactions occurred inside the house, the Tenth Circuit found there was insufficient evidence to support the inference of a nexus between the weapon and narcotics activity. We do not believe that the Tenth Circuit's decision in G mez- ______ Arrellano to use 924(c) as a model for interpreting _________ 2K2.1(b)(5) is inconsistent with Sanders, in light of the _______ intervening United States Supreme Court case. Moreover, our interpretation of 2K2.1 (c)(2) is consistent with the Supreme Court's interpretation of similar language in 924(c). We also believe that the facts of the present case show a stronger connection between the firearm possession and drug offenses than did the facts in G mez-Arrellano. _______________ -16- Jackson was the "Boss," who was supported in his business by his "boys," one of whom was Thompson. As the district court found, it was imminently reasonable to believe that Thompson knew about this drug dealing operation -- he was present on numerous occasions when the CI went to Theodore Street to purchase cocaine and cocaine base, and while there, saw drug related activities openly occurring in the apartment. While purchasing drugs, the CI repeatedly sought to purchase firearms as well. Specifically, the CI was looking to purchase a handgun on October 11, 1991, when he bought a quarter- kilogram of cocaine base at Theodore Street. The handgun was not available and the CI was told to come back the next day. On October 12, the CI returned to Theodore Street to purchase the gun, and Thompson, along with Henry, personally delivered the 9 millimeter pistol and ammunition to the CI. Essentially, this completed the sale from the previous day. It does not in any way strain credulity to believe that the Theodore Street group's sale of the firearm to the CI facilitated the cocaine and cocaine base sales. The evidence reasonably suggested that the cast of characters at Theodore Street was in the business of supplying both drugs and firearms, and that they were willing to obtain whatever contraband the CI requested, in order to accommodate a good customer and to maintain his confidence and business. Thompson argues that the requisite nexus should only be found to exist when there is some type of physical proximity between the firearm and the drugs. The guideline does not -17- require that the defendant actually use the firearm himself, or use the firearm in any particular way. Rather, as we have already determined, the language of the guideline is broad. The combination of firearms and drugs is common, and the guideline encompasses the many logical links which exist between the use of firearms and drugs. Thompson also points out that the usual case in which the 2K2.1 cross-reference is used to apply drug guidelines to a firearms offender is where the defendant used a firearm for protection during a drug transaction or had the firearm available to protect his supply of drugs. While this may be the most common scenario, it is certainly not the only type of situation. Rather, the cross-reference has been applied in a variety of factual scenarios where a firearm has somehow aided or facilitated the cross-referenced offense. See, e.g., United ___ ____ ______ States v. Patterson, 947 F.2d 635, 636 (2d Cir. 1991) (finding ______ _________ that the district court properly applied 2K2.1(c)(2) enhancement when evidence showed that defendant had a gun under the front seat of his car while he was driving to purchase drugs, even though no drugs were physically present in the car.) Here, the requisite nexus existed by virtue of the fact that the enterprise, which Thompson was associated with, sold the guns and drugs together, in an attempt to accommodate a customer and maintain his business. The application of the 2K2.1(c)(2) cross-reference to Thompson reflects the seriousness of firearm possession in connection with other felonies, and the reality -18- that when firearms are possessed or used in connection with drug offenses, there is a greater threat to public safety. See, e.g., ___ ____ United States v. McFadden, 13 F.3d 463, 464 (1st Cir. 1994) ______________ ________ (noting that Congress viewed the connection between firearm possession in relation to drug trafficking provided by 18 U.S.C. 924(c) very seriously by requiring a mandatory five year sentence, thus denying parole to an offender at a time when parole was ordinarily available as a matter of course); U.S.S.G. 2D1.1(b)(1) comment (n.3) (1990) (enhancement of drug trafficking offense for weapons possession reflects the increased danger of violence when drug traffickers possess weapons). For the foregoing reasons, the district court correctly applied U.S.S.G. 2K2.1(c)(2), and the sentence is affirmed. ________ -19-