RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

GEORGE OSCAR MESSER (22-5420), JAKE MESSER (22-5473),

*Defendants-Appellants*.

> Nos. 22-5420/5473

───────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:20-cr-00070—Robert E. Wier, District Judge.

Decided and Filed:  June 21, 2023

Before:  GILMAN, BUSH, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Robert L. Abell, ROBERT ABELL LAW, Lexington, Kentucky, for Appellant in 22-5420.  Martin J. Beres, Clinton Township, Michigan, for Appellant in 22-5473.  Michael A. Rotker, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., UNITED STATES ATTORNEY OFFICE, Lexington, Kentucky, for Appellee.

───────────────

## OPINION

───────────────

RONALD LEE GILMAN, Circuit Judge.  Following separate jury trials, defendants George Oscar Messer (Oscar) and his son Jake Messer (Jake) were each convicted on two counts of kidnapping, in violation of 18 U.S.C. § 1201(a)(1).  They were both sentenced to terms of life imprisonment because of various sentencing enhancements, including one for sexual exploitation.

Both defendants appeal their convictions, arguing that the federal kidnapping statute is (1) an unconstitutional exercise of Congress's power under the Commerce Clause, and (2) unconstitutionally vague. Jake also appeals his sentence as procedurally and substantively unreasonable. For the reasons set forth below, we **AFFIRM** the judgments of the district court.

## I. BACKGROUND

### A. The kidnapping

On April 28, 2018, a person identified in the record as "Victim One" (V1) informed Jake that $10,000 worth of marijuana was for sale. Jake had $7,000 of his own funds available, but borrowed the remaining $3,000 from his friend Scott Patterson. Jake and V1 then went to Corbin, Kentucky to complete the deal, but the supposed sellers instead took the buy money and fled without supplying any marijuana.

Jake suspected that V1 had been involved in the theft. He intended to confront V1 in nearby Clay County at a remote trailer where Jake's friend Stephen Jewell lived. Before leaving with V1, Jake told Patterson to bring a person identified in the record as "Victim Two" (V2), V1's girlfriend, to the trailer as an "insurance policy." Patterson agreed to Jake's request.

Jake and his girlfriend Jessica Karr then drove to the trailer with V1, while Patterson and his girlfriend Myra Van Denk drove separately to the trailer with V2. The drivers traveled north on Interstate 75 and then northeast on Kentucky Highway 80 until they reached the trailer of Jewell's grandmother. At no time did the cars or their occupants leave Kentucky.

V1 and V2 were, at Jake's direction, placed in separate bedrooms in the trailer. Jake told Jewell to search V1's phone for any evidence of V1's involvement in the theft. He then called Oscar and told him about what had transpired. After receiving Jake's call, Oscar and his friend Joshua Mills gathered several firearms and drove to the trailer. During this time, Jake's friend Jewell and others communicated with Jake via cell-phone text messages and Facebook messages using the trailer's Wi-Fi network.

For the next 10 hours, V1 and V2 were held against their will and repeatedly threatened with bodily harm if the money was not returned. Jake instructed Jewell to retrieve zip ties and

duct tape from Patterson's car, to be used to restrain the victims.  In the meantime, Oscar placed a gun to V1's head and threatened to kill him unless he told them where the money was.  And Van Denk at one point heard Jake tell V1 that, if he did not confess to involvement in the theft, they would make V2 "suck every dick in this house" and make him watch.

Jake later told V2 that, if she agreed to have sex with him, he would allow her to leave. V2 agreed, but only on the condition that Jake allow V1 to leave unharmed as well.  Jake then pulled V2's pants down and began forcibly penetrating her.  When V2 asked Jake to stop, he put his forearm on the back of her neck and held her down until he ejaculated inside of her. Patterson was told by Jake that he had "fucked [the] old girl."  Jake and Karr then left the trailer for about an hour.

During Jake's absence, Oscar entered V2's room and forced her at gunpoint to pull her pants down.  Oscar then began performing oral sex on V2 while still holding a firearm in one hand.  Patterson opened the door during the assault and noticed that V2's wrists were bound.

Oscar later began driving V1 and V2 to his residence in Whitley County.  Sometime during the drive, Oscar stopped the vehicle.  V1's mother, who had been looking for her son for two days, drove up and demanded that V1 and V2 get into her car, which they did.

**B.  The trials**

On November 5, 2020, Oscar waived his Miranda rights and, in a two-hour-long recorded interview, made numerous incriminating statements regarding his and Jake's conduct during the kidnapping.  Fourteen months later, a grand jury returned a superseding indictment alleging that Oscar and Jake did "willfully and unlawfully kidnap, abduct, seize, and confine" V1 (Count 1) and V2 (Count 2) "for the purpose of assault," and "use[d] a means, facility, and instrumentality of interstate commerce, to wit: the Internet, Facebook accounts, Interstate Highway 75, Kentucky Highway 80, and a Ford Expedition (1999)," in violation of 18 U.S.C. § 1201(a)(1).

Oscar moved to dismiss the indictment, alleging that the application of 18 U.S.C. § 1201(a) to the facts of this case exceeded Congress's powers under the Commerce Clause because none of the abductors or victims crossed state lines, and that § 1201(a)(1)'s

"or otherwise" clause was impermissibly vague. The district court denied the motion. In light of Oscar's statements during the two-hour interview, the court severed Oscar's case from Jake's and, following separate trials, the defendants were each convicted on both counts.

## C. Jake's sentencing

Jake's Presentence Report (PSR) for Count 1 (relating to V1) calculated a total adjusted offense level under the United States Sentencing Guidelines of 44, which reflected a base offense level of 32, a 6-level ransom-demand enhancement, a 2-level dangerous-weapon enhancement, and a 4-level leadership enhancement. For Count 2 (relating to V2), the PSR used the same calculations but recommended an additional 6-level enhancement for sexual exploitation, resulting in a total adjusted offense level of 50.

Applying the grouping rules, the PSR added one level to the higher of the two scores, which resulted in a total combined adjusted offense level of 51. The PSR also recommended a criminal-history category of VI. With an offense level of 51 (treated as an offense level of 43, which is the highest offense level contemplated by the Guidelines) and a criminal-history category of VI, Jake was subject to a Guidelines sentence of life imprisonment. Jake filed several written objections to the PSR, but the district court overruled all of them.

At the sentencing hearing, the court allowed the government to present testimony, over Jake's objection, regarding Jake's allegedly violent and sexually harassing behavior toward three other women and a minor. Jake was ultimately sentenced to life imprisonment as recommended by the Guidelines.

## D. Oscar's sentencing

Oscar's PSR calculated a total adjusted offense level of 50. He received the same enhancements as Jake with respect to both V1 and V2, but received only a 3-level enhancement for his leadership role in the offense. Oscar was also sentenced to life imprisonment as recommended by the Guidelines, a sentence that he does not challenge on appeal.

## II.  ANALYSIS

**A.  The district court correctly denied the defendants' motion to dismiss the indictment**

As a threshold matter, the government suggests that Jake's notice of joinder adopting Oscar's appellate arguments is deficient because (1) "Jake's notice does not attempt to show" the transferability of Oscar's arguments to Jake's case, and (2) "Jake did not raise the arguments he wants to adopt below."  We disagree.

The record plainly belies the government's claim that Jake failed to raise the relevant arguments before the district court.  In any event, as Jake points out, the arguments that he wishes to adopt "relate to the strictly legal issue" regarding the validity of the indictment under which both Oscar and Jake were charged, and "the facts upon which the indictment was based were exactly the same" for both defendants.  *See United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996) ("[A]doption . . . is permitted in the interest of judicial efficiency when the arguments to be adopted are equally applicable to the adopting co-appellants . . . .").  We therefore cannot credit the government's contention that Oscar's arguments are not transferable to Jake.  These arguments, however, are without merit given recent decisions by this court.

### 1.  *Precedent forecloses the defendants' Commerce Clause argument*

As Oscar admits in his reply brief, the defendants' challenge to the federal kidnapping statute—namely, whether the Commerce Clause grants Congress the authority to regulate activity that (1) uses, on an intrastate basis, instrumentalities of interstate commerce, and (2) is not directed at those instrumentalities—was disposed of by this circuit in *United States v. Windham*, 53 F.4th 1006, 1012-13 (6th Cir. 2022).  And because, as Oscar puts it, "[t]here does not appear to be a material factual distinction between *Windham* and this case," we are bound by the ruling in *Windham*.  By well-settled law, "[a] panel of this Court cannot overrule the decision of another panel.  The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision."  *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).

### 2. *Precedent forecloses the defendants' void-for-vagueness argument*

The defendants also argue that the phrase "or otherwise" in the federal kidnapping statute, which prohibits the kidnapping of a person "for ransom or reward or otherwise," 18 U.S.C. § 1201(a), is unconstitutionally vague. "The void-for-vagueness doctrine requires that [a] statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Kerns*, 9 F.4th 342, 351 (6th Cir. 2021) (alteration in original) (quoting *United States v. Farah*, 766 F.3d 599, 614 (6th Cir. 2014)).

"The Supreme Court has explained that 'or otherwise' [in 18 U.S.C. 1201(a)] encompasses any benefit which a captor might attempt to obtain for himself." *Id.* (citing *Gooch v. United States*, 297 U.S. 124, 128 (1936)). And as this court concluded in rejecting a similar void-for-vagueness challenge to the federal kidnapping statute, the "expansive reach" of the term "otherwise" is sufficient to defend against the assertion that "any person of ordinary intelligence would fail to understand what conduct it forbids." *Id.* (quoting *Daulton v. United States*, 474 F.2d 1248, 1248-49 (6th Cir. 1973) (per curiam)).

There can be no doubt that the defendants here were fully aware of their illegal conduct in kidnapping V1 and V2. And to the extent that the defendants are separately suggesting that the "otherwise" language is so broad that it encourages "arbitrary and discriminatory enforcement," *see, e.g.*, *McDonnell v. United States*, 579 U.S. 550, 576 (2016) (recognizing that a law can be unconstitutionally vague based on its breadth); *see also Kerns*, 9 F. 4th at 356 (Readler, J., concurring), that argument is made for the first time on appeal and is insufficiently explored by our court's precedents to warrant reversal on plain-error grounds, *see United States v. Woodruff*, 735 F.3d 445, 450 (6th Cir. 2013).

## B. Jake's arguments regarding the alleged procedural and substantive unreasonableness of his sentence are unavailing

### 1. *Jake's sentence is procedurally reasonable*

For a sentence to be procedurally reasonable, "[t]he court must properly calculate the guidelines range, treat that range as advisory, consider the sentencing factors in 18 U.S.C.

§ 3553(a), refrain from considering impermissible factors, select the sentence based on facts that are not clearly erroneous, and adequately explain why it chose the sentence." *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018) (citing *Gall v. United States*, 552 U.S. 38, 51 (2007)). "We review a district court's efforts to touch each of these bases for abuse of discretion, keeping in mind that factual findings will stand unless clearly erroneous and legal conclusions will stand unless our fresh review leads to a contrary conclusion." *Id.* (citing *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007)).

### a. The district court properly calculated Jake's Guidelines range

#### i. The district court did not clearly err in treating Jake's federal drug-conspiracy conviction as part of his criminal history rather than as relevant conduct

Jake argues that his 2018 federal conviction for (1) conspiracy to distribute controlled substances, and (2) possession with the intent to distribute a methamphetamine mixture should have been treated as "relevant conduct" to the instant offense, rather than as a "prior sentence," for sentencing purposes. The 2018 conviction concerned a conspiracy to distribute various controlled substances, including marijuana, from June 2017 until on or about July 4, 2018, within the state of Kentucky, and thus overlapped with the April 28, 2018 kidnapping incident in question. But we find no error in the district court's decision to treat the 2018 conviction as part of Jake's criminal history.

Whether an offense constitutes a "prior sentence" is "necessarily a fact-specific inquiry." *United States v. Beddow*, 957 F.2d 1330, 1338 (6th Cir. 1992), *abrogated on other grounds by United States v. Cabrales*, 524 U.S. 1 (1998). This inquiry "involves more than just a consideration of the elements of the two offenses" and includes "the temporal and geographical proximity of the two offenses, common victims, and a common criminal plan or intent." *Id.* We review the district court's factual findings under the clear-error standard. *Id.*

The district court determined that Jake's 2018 conviction and the instant offense were distinct, and that the 2018 conviction should accordingly be considered a "prior sentence." In reaching this determination, the district court noted that (1) the failed drug buy that led to the kidnappings involved a different supplier from a different state than the purchases underlying the

general drug conspiracy, (2) the fallout from the failed drug buy constituted a separate "criminal cluster" from the general drug conspiracy, and (3) the kidnappings produced "different harms" than did the general drug conspiracy.

Jake is correct that the 2018 conviction and the kidnappings overlapped geographically and temporally. His view of the evidence—that his 2018 conviction encompassed conduct that was "part of the instant offense," *see id.*—is plausible. But the district court acknowledged this overlap and found that it did not outweigh the remaining *Beddow* factors. And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999) (citing *Hernandez v. New York*, 500 U.S. 352, 369 (1991)).

Jake makes several arguments that are derivative of his claim that his 2018 conviction should have been categorized as "relevant conduct." But because his primary argument fails, so do these derivative theories.

### ii. The district court properly applied the dangerous-weapon enhancement

Jake also objects to the two-level dangerous-weapon enhancement. The Guidelines authorize such an enhancement "[i]f a dangerous weapon was used" in the commission of a kidnapping, abduction, or unlawful restraint. U.S.S.G. § 2A4.1(b)(3).

Jake argues that he never personally possessed a firearm, and that "the possession of firearms by others was outside the scope of his relevant conduct." In fact, as the government acknowledges, if Jake had only *possessed* a firearm, without more, that would not have been sufficient to justify the enhancement. *See United States v. Covert*, 117 F.3d 940, 947 (6th Cir. 1997) ("[T]he term 'possess' used in sentencing guideline sections, such as [U.S.S.G. §] 2K2.1(b)(5), sweeps more broadly than the word 'use.'").

But the district court looked to evidence that other people present in the trailer *had* used firearms, even though Jake personally had not "himself used a dangerous weapon in the way that he would have to to earn these two points on his own." The district court found that Jake could reasonably foresee that his confederates, whom Jake knew to be armed, would have used a

firearm in, at minimum, sexually assaulting V2.  And "in the case of a jointly undertaken criminal activity ( . . . whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity shall be used to determine the base offense level and adjustments." *United States v. Critton*, 43 F.3d 1089, 1098 (6th Cir. 1995) (citing U.S.S.G. § 1B1.3(a)(1)(B)).

Jake nonetheless argues that the enhancement was improperly applied.  Application Note 2 to U.S.S.G. § 2A4.1 provides two definitions for the "use" of a dangerous weapon: "a firearm was discharged, or a 'firearm' or 'dangerous weapon' was 'otherwise used' (as defined in the Commentary to § 1B1.1)."  But by Jake's reading, the "use" of a firearm as contemplated by the text of the Guidelines themselves is limited to a firearm's discharge.  He argues that to consider other uses would allow the commentary to the Guidelines to expand the Guidelines' scope, in violation of the principle that this court announced in *United States v. Havis*, 927 F.3d 382, 386-87 (6th Cir. 2019) (en banc).  As the district court recognized, however, a gun can be used without being discharged.  *See United States v. Bolden*, 479 F.3d 455, 461-63 (6th Cir. 2007) (recognizing the Guidelines' distinction between "discharging," "brandishing or possessing," or "otherwise using" a firearm, and concluding that "pointing a firearm at an individual coupled with a demand of that individual constitutes otherwise using a firearm, and not merely brandishing one").  To acknowledge that fact does not expand the Guidelines' scope, but simply interprets the plain language in question.

### iii. The district court properly applied the sexual-exploitation enhancement

Jake next argues that the district court erred in applying a six-level enhancement for sexual exploitation in his Guidelines calculation.  The enhancement is warranted in kidnapping cases "[i]f the victim was sexually exploited."  U.S.S.G. § 2A4.1(b)(5).  Jake argues that the enhancement was improper because "[a] finding of sexual exploitation was not specifically submitted to the jury."  But whether or not Jake sexually assaulted V2 does not alter the statutory minimum or maximum penalty to which he is subject, so the question did not need to be submitted to a jury.  *See United States v. Cooper*, 739 F.3d 873, 884 (6th Cir. 2014) (reiterating

that judicial factfinding that affects a Guidelines calculation is not unconstitutional if it does not alter the penalty's statutory bounds).

Jake alternatively argues that "a reasonable person in his position" would have believed that the sexual conduct was consensual. His position is based on "the numerous Facebook exchanges introduced at trial between Jake and [V2]—and her and [V1]'s trial testimony— including the months up to the kidnapping and even in the days after, in which [V2] offered sex to Jake . . . to reduce [V1]'s drug debt." Jake also claims that the district court erred in holding him accountable for the sexual assault committed against V2 by his father.

On the record before us, however, we cannot find that the district court's conclusion that "[t]here [wa]s no plausible way" for Jake, in the midst of "an armed kidnapping," to have "thought to himself that [V2] was consenting to sex based on messages that they had weeks, months before" was an impermissible view of the evidence. And because the enhancement turns on whether the victim was sexually exploited, not on how many times such sexual exploitation took place, we need not consider Jake's argument related to Oscar's conduct.

### iv. The district court properly applied the leadership enhancement

Jake also objects to the leadership enhancement. The Guidelines authorize a four-level enhancement in any case in which "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In determining whether a person was an organizer or leader, the court should consider

> the exercise of decisionmaking authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*Id.*, Application Note 4.

In its review of the record, the district court found that Jake had "recruited . . . the key other players" and had a "hand and authority on dictating what would happen when they got to that trailer." Specifically, the court noted that Jake "told Jewell to take [V1's] phone and search

it," and "twice directed Jewell to go get the zip ties and duct tape." The court also found that Jake "had control over the plan," including where the victims were placed in the trailer, and whether each victim knew that the other was there. Faced with these facts, we find no reason to question the district court's conclusion that Jake was more "relative[ly] culpab[le]" than other participants in the scheme.

### v. If the district court erred in applying the ransom-demand enhancement, that error was harmless

In his next challenge to his Guidelines calculation, Jake argues that the district court improperly applied a six-level enhancement for having made a ransom demand. The other circuits to have considered the ransom-demand enhancement on the merits have held that the enhancement may be applied only if a ransom demand is made upon a third party. *See United States v. Reynolds*, 714 F.3d 1039, 1044 (7th Cir. 2013) ("§ 2A4.1(b)(1) may be applied only if kidnappers' demands for 'money or other consideration' reach someone *other* than the captured person." (emphasis in original)); *United States v. Fernandez*, 770 F.3d 340, 343 (5th Cir. 2014) ("[T]he ransom enhancement applies anytime a defendant demands money from a third party for a release of a victim, regardless of whether that money is already owed to the defendant." (quoting *United States v. Sierra-Velasquez*, 310 F.3d 1217, 1221 (9th Cir. 2002))); *Sierra-Velasquez*, 310 F.3d at 1221 (same); *see also United States Escobar-Posado*, 112 F.3d 82, 83 (2d Cir. 1997) (finding "that [the defendant]'s actions fell well within the meaning of a ransom demand: he threatened to kill hostages Jane Does # 1 and # 3 unless Jane Doe # 2 procured $300,000 for their release," but not expressly ruling on whether a demand on a third party was a prerequisite to imposing the enhancement); *United States v. Romero*, 906 F.3d 196, 205-09 (1st Cir. 2018) (holding that the district court did not plainly err in declining to apply out-of-circuit caselaw requiring a demand on a third party to impose the enhancement, but stating that it was not "tak[ing] a definitive stand on the ransom-demand issue" on the merits). No third party was involved in the instant offense.

We find no need to decide this issue here. Jake objected to the application of the ransom-demand enhancement, but his argument focused only on the lack of an express demand for money in exchange for release. We have received no briefing as to whether a third party is a

key element of the ransom-demand enhancement. And even without the ransom-demand enhancement, Jake's offense level would have been 45 (base offense level of 32, 2-level dangerous-weapon enhancement, 4-level leadership enhancement, 6-level sexual-exploitation enhancement, and 1-level combination enhancement). As the district court observed, "any [level] 43 regardless of your criminal history category, the guideline range would be life in prison." **[R.281, PageID 2403]**

This court dealt with a similar scenario in *United States v. Faulkner*, 926 F.3d 266 (6th Cir. 2022). In that case, this court held that, "because [the defendant]'s offense level was 43, the Guidelines range was life in prison, regardless of his criminal history category." *Id.* at 275. Accordingly, "[a]ny error by the district court . . . would have had no effect on the ultimate sentence, and was thus harmless." *Id.* The same is true here.

### b. The district court properly treated the Guidelines as advisory

Jake next argues that the district court "essentially considered the Sentencing Guidelines as mandatory" by not departing from them. *See United States v. Stone*, 432 F.3d 651, 654 (6th Cir. 2005) ("Based on the Supreme Court's ruling in *Booker*, the Sentencing Guidelines are no longer mandatory; they are advisory."). This argument lacks merit because the district judge expressly remarked that he "always consider[s] a variance in every case," particularly when the Guidelines recommended a life sentence, "because the guidelines don't dictate the result."

### c. The district court did not rely on impermissible factors or clearly erroneous facts

Jake further contends that the district court's Guidelines calculations reflect "numerous erroneous interpretations of the facts adduced at trial." But Jake does not dispute the basic contours of facts as outlined by the court with respect to the events of April 28, 2018. In any event, we agree with the government that, although Jake might disagree with the court's findings, they are permissible on the record before us, and so we have no reason to disturb them.

Jake also argues that the district court erred in relying on the hearsay evidence proffered by Agent Todd Tremaine regarding Jake's allegedly violent conduct directed at other women. Specifically, he claims that Agent Tremaine's testimony lacked the "minimum indicia of

reliability" required of hearsay evidence at sentencing. *See United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007). We find no error, however, because the court specifically declined to "premise any kind of sentencing" on Agent Tremaine's testimony.

### 2. *Jake's sentence is substantively reasonable*

Finally, Jake argues that his sentence is substantively unreasonable. "We presume a within-Guidelines sentence is substantively reasonable. But a defendant can rebut this presumption if a district court chose a sentence arbitrarily, ignored pertinent § 3353(a) factors, or gave unreasonable weight to any single factor." *United States v. Gardner*, 32 F.4th 504, 530 (6th Cir. 2022) (citing *United States v. Conatser*, 514 F.3d 508, 520 (6th Cir. 2008)). Like procedural reasonableness, the substantive reasonableness of a sentence is reviewed under the abuse-of-discretion standard. *Id.*

Here, the district court conducted a comprehensive analysis of the relevant sentencing factors. These factors included mitigating ones. In particular, the district court was sensitive to Jake's drug addiction at the time of the crime, the relatively short length of the kidnappings, the lack of physical injury to V1, the lack of a significant deterrence value between 30 years' imprisonment and a life sentence, Jake's strong work history, and Jake's recent turn to sobriety and religion.

Even so, the district court found that the aggravating circumstances of the case meant that a downward variance was not warranted. Contrary to Jake's claim, the district court did consider whether a life sentence would create a disparity between Jake and similarly situated defendants. But it was not required to rule in any particular way based only on such a disparity. *See United States v. Rayaan*, 885 F.3d 436, 442 (6th Cir. 2018) (whether the district court "placed too much weight on some of the § 3553(a) factors and too little on others in sentencing the individual . . . is a matter of reasoned discretion, not math, and our highly deferential review of a district court's sentencing decisions reflects as much" (citing *Gall v. United States*, 552 U.S. 38, 51 (2007))). Jake similarly argues that the district court overlooked that he was already serving a 151-month sentence for his 2018 drug conviction. The district court, however, considered Jake's argument

and rejected it, concluding that "the sentence that's reasonable for this case is life in prison with or without the [2018 sentence] interplay."

A life sentence is an extraordinary punishment.  But as an appeals court, we are not permitted to engage in a de novo reweighing of the § 3553(a) factors.  *Gardner*, 32 F.4th at 530. And in the present case, despite the extremity of the sentence, we can find no abuse of discretion by the district court in imposing the sentence recommended by the Guidelines.

### III.  CONCLUSION

For all of the foregoing reasons, we **AFFIRM** the judgments of the district court.