# United States Court of Appeals
## For the First Circuit

No. 13-1256

UNITED STATES OF AMERICA,

Appellee,

v.

LEVELL MATTHEWS,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Thompson and Kayatta, Circuit Judges.

Joseph M. Bethony, with whom Gross, Minsky, Mogul, P.A., was on brief, for appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellee.

May 16, 2014

**THOMPSON, <u>Circuit Judge</u>.**

## OVERVIEW

Levell Matthews stands convicted of one count of conspiring with others to make false statements to a firearms dealer, three counts of possessing a firearm following a felony conviction, and one count of possessing marijuana. He complains about the district court's rulings denying him a judgment of acquittal on the marijuana-possession count and enhancing his sentence four levels for possessing a gun "in connection with" felony drug trafficking. Finding none of his arguments persuasive, we affirm.

## HOW THE CASE GOT HERE

We summarize the trial evidence against Matthews in the light most favorable to the jury's verdict. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Acosta-Colón</u>, 741 F.3d 179, 191 (1st Cir. 2013).

### Arrest and Indictment

This is not Matthews's first scrape with the law. In 2009 he was convicted in New York of possessing cocaine with intent to distribute — a crime punishable by more than one year's imprisonment. Some time after he got off parole for that offense, he headed to Maine, staying occasionally with Taleek McFadden and Victor Morales at Renee Weeks's house. No Boy Scout himself, McFadden would later get locked up for selling crack cocaine.

In October 2011 Matthews and Morales walked into a store called Frati the Pawn Brokers.  We will refer to this shop as "Frati's," to avoid any confusion with its eponymous owner, Orlando Frati, who — importantly — is a federally-licensed firearms dealer. Matthews checked out a couple of guns while there, actually holding them in his hand.

About two weeks later, Matthews and Morales stopped by Frati's again, this time with Weeks in tow.  Matthews zeroed in on a Taurus .45 caliber pistol, picking it up to get a closer look. Weeks then told Frati that she wanted to buy the pistol.  Frati handed Weeks the federal form — "Form 4473" — that anyone trying to buy a gun must complete.  After getting the filled-out document, Frati ran a background check on her to see whether the sale could take place that day.  He learned that Weeks's name went to "delayed status," which meant the sale could not happen right away, so Matthews, Morales, and Weeks took off.[1]  Suspecting that Weeks wanted to buy the gun for Matthews, Frati tipped off ATF agent Brent McSweyn, who began to investigate.[2]

Around this time, Matthews — while riding in a car owned by Weeks but driven by McFadden — was searched by local police

---

[1] "Delayed status" occurs where a name is "technically flagged for one reason or another," which could be, for example, because someone has "had any encounter with the court or law enforcement."

[2] "ATF" is the usual acronym for the Bureau of Alcohol, Tobacco, Firearms and Explosives.

during a traffic stop. Turned out Matthews had $2,500 in cash on him, though that is basically all we know about the stop.

Fast forward a few weeks. Acting on Agent McSweyn's instructions, Frati called Weeks to let her know that she could buy the Taurus pistol. She said that she would be there in ten minutes. Waiting for her to show up, Agent McSweyn placed ATF agent Paul McNeil in an unmarked car outside Frati's and ATF agent Daniel Woolbert in the store, posing as an employee. Agent McSweyn then hid in the store's back room.

Eventually, Weeks drove over with Matthews and another woman. Only Weeks went inside, though, with $250 Matthews had given her to buy the pistol. Her mission complete, Weeks jumped back into her car's driver's seat and put the pistol (unloaded, with the safety lock on) on her lap, seconds before Agent McNeil approached the driver's side and Agent McSweyn approached the passenger's side. Agent McSweyn ordered Matthews — who was sitting in the front passenger seat — out of the car. And then Agent McSweyn frisked Matthews for weapons. Matthews had $967 in his pocket, with a $50 bill on his seat in the car.

Agent McNeil told Matthews that he was not under arrest. But Matthews wanted to "clear things up." So Agent McNeil read Matthews his <u>Miranda</u> rights, <u>see</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436 (1966), and Matthews started talking. No way would he ever ask Weeks to get him a gun, Matthews said, because he was a convicted

-4-

felon and knew that he could not have a firearm. That statement did not jibe with Matthews's going to Frati's and actually looking at guns, Agent McNeil shot back. Matthews replied, "uh oh."

As they talked, Agent McNeil smelled burnt marijuana and asked Matthews what he had "taken that day." Matthews admitted that he had smoked two "blunts" (cigars in which the tobacco has been replaced with marijuana) but said that there was no marijuana in Weeks's car. "You want to know where you fucked up?" Matthews then asked McNeil. "What you should have done," Matthews said, was "wait to see where" Weeks took "the gun to see who she [was] buying it for." A smiling Agent McNeil simply fired back, "some people" might say that is "exactly what we did do. We didn't arrest Ms. Weeks at the counter. We waited to see, when she left the store, who was in the car and who she was getting the gun for." "Oh," Matthews exclaimed, catching Agent McNeil's drift, "because she was in the store that I had been [in], bought the gun that I had looked at, came out to the car that I was sitting in, and I have [hundreds of dollars] in my pocket[?]" Bingo, Agent McNeil basically said — to which Matthews replied, "that's cold" (with "cold" being slang for "harsh," or so Agent McNeil testified).

Agent McSweyn then arrested Matthews. Knowing the jig was up, Matthews said that he had some "weed" stuffed in his underwear — 3.2 grams worth, tests showed. He also said that he had $4,000 hidden in his sock, though he actually had $3,700. For

anyone keeping track, that is $7,217 in cash law enforcement had caught him with over a fairly short period (we are talking weeks).

A federal grand jury later indicted Matthews, with the operative document charging him with one count of conspiracy to make false statements on a federal firearms application,[3] three counts of gun possession by a previously convicted felon,[4] and one count of marijuana possession.[5]  Matthews pled not guilty to all charges.  And a jury trial followed in due course.

## Trial and Sentencing

The trial testimony came in consistent with the facts described above.  What we have not mentioned yet is that Weeks — having copped a plea and agreed to testify for the government — told the jury about Matthews's involvement with crack cocaine, saying that she had seen him with crack and had bought crack from him before.  Asked whether she was "promised crack" if she helped with the gun buy, Weeks answered "yes."  Matthews's counsel attacked her credibility by getting her to talk about how she was a chronic drug abuser, with crack and marijuana being her go-to drugs.

Matthews moved for acquittal at the close of the government's case.  See Fed. R. Crim. P. 29(a).  As relevant here,

---

[3] See 18 U.S.C. §§ 2, 371, 924(a)(1)(A), and 922(a)(6).

[4] See 18 U.S.C. §§ 2, 922(g)(1), and 924(a)(2).

[5] See 21 U.S.C. § 844.

-6-

he argued that prosecutors had failed to prove an element required by § 844 — namely, that he did not have a valid prescription for the marijuana. Convinced that the non-existence of a valid prescription is not an element of a § 844 offense, the district court denied the motion. After the jury convicted him on all counts, Matthews again moved for acquittal on this theory. See Fed. R. Crim. P. 29(c). But the court denied that motion too.

At sentencing the parties battled over whether the district court should hand Matthews a four-level enhancement under the federal sentencing guidelines for possessing a firearm in connection with another felony. See USSG § 2K2.1(b)(6). Leaning heavily on United States v. Cannon, 589 F.3d 514 (1st Cir. 2009), the court imposed the enhancement, describing the other felony as "drug trafficking" rather than marijuana possession, and concluding Matthews had possessed a gun in connection with that offense. This enhancement helped set Matthews's sentencing range at 70-87 months in prison. And, ultimately, the court imposed a 70-month term.

This appeal followed. In resolving it, we will add a few more details as we discuss specific issues.

**OUR TAKE ON THE CASE**

As we mentioned at the beginning of this opinion, Matthews challenges the denial of his acquittal motion on the marijuana-possession count plus the imposition of the four-level

sentencing enhancement.  As we also noted, his arguments do not carry the day for him, for reasons we now explain.

<u>Judgment of Acquittal</u>

First up is the judgment-of-acquittal issue, which we review <u>de novo</u>.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Dávila-Nieves</u>, 670 F.3d 1, 7 (1st Cir. 2012).

Section 844 — a provision under the Controlled Substance Act ("CSA") forming the basis of Matthews's marijuana-possession conviction — pertinently provides that

> [i]t shall be unlawful for any person knowingly or intentionally to possess a controlled substance <u>unless</u> such substance was obtained directly, or pursuant to a valid prescription or order, from a practitioner, while acting in the course of his professional practice.

21 U.S.C. § 844(a)(1) (emphasis added).  Matthews reads the "unless" clause as requiring the government to prove that he did not have a valid marijuana prescription.  But another statute that he does not mention or cite — 21 U.S.C. § 885, titled "Burden of proof; liabilities" — undoes his theory.

Subsection (a)(1) of § 885 — titled "Exemptions and exceptions; presumption in simple possession offenses" — declares in relevant part that

> [i]t shall not be necessary for the United States to negative any exemption or exception set forth in this subchapter in any . . . indictment . . . or in any trial . . . and the burden of going forward with the evidence with

-8-

> respect to any such exemption or exception shall be upon the person claiming its benefit.

Subsection (a)(2) adds that in § 844(a) prosecutions "any label identifying such substance . . . shall be admissible in evidence" and that the label "shall be prima facie evidence that such substance was obtained pursuant to a valid prescription from a practitioner."

The precise issue Matthews raises is not one we have faced before. The closest match in our caselaw is <u>United States</u> v. <u>Hooker</u>, an opinion dealing with CSA sections different from the one that confronts us here — §§ 841 and 846, not § 844. <u>See</u> 541 F.2d 300, 301 (1st Cir. 1976). A jury had convicted Hooker — a licensed physician — of distributing and conspiring to distribute prescriptions for controlled substances. <u>Id.</u> at 301-02 (citing §§ 841 and 846). Trumpeting his physician status, Hooker argued to us that he had statutory authorization to dispense controlled substances and so could not be convicted of illegal distribution unless the prosecution proved beyond a reasonable doubt that his deeds fell "outside the bounds of the professional medical practice." <u>Id.</u> at 305. Critically, in analyzing his argument we noted that under § 885(a)(1) "a defendant claiming the benefit of a medical exemption bears the evidentiary burden with respect to its applicability." <u>Id.</u>

<u>Hooker</u> helps us understand § 885(a)(1)'s effect on evidentiary burdens in this corner of the law. But what ultimately

-9-

seals Matthews's fate is a line of cases from other circuits expressly holding — based on a plain reading of the statutory text — that § 844(a)'s "unless" clause "establishes a defense" for "the accused" to raise "rather than an element of the offense" for the government to prove.  See United States v. Forbes, 515 F.2d 676, 680 n.9 (D.C. Cir. 1975); see also United States v. Foster, 374 F. App'x 448, 449 (4th Cir. 2010) (per curiam) (relying on § 885(a)(1) in rejecting the idea that § 844(a) has as an element that the defendant did not possess the drugs pursuant to a valid prescription); see generally Woods v. Butler, 847 F.2d 1163, 1166-67 (5th Cir. 1988) (relying on Forbes in analyzing state statutes "virtually identical" to §§ 844(a) and 885(a)(1), and reaching the same result).[6]

A principle animating these cases is that a contrary ruling would blot out § 885(a)(2).  Again, that provision provides that a label is prima facie evidence that the drugs were obtained lawfully — without any contrary evidence by the government, that showing would satisfy § 844(a)'s "unless" clause. Matthews offered no prima facie evidence, we must say.  Anyway, accepting his argument would mean forcing the government to "negate" the possibility of a valid prescription "even in the absence of the label."  Forbes, 515 F.2d at 680 n.9.  And that cannot be what

---

[6] Courts grappling with this issue apparently use "'exemption,'" "'affirmative defense,'" and like words "interchangeably."  See Woods, 847 F.2d at 1165 n.1.

Congress had in mind when it set up a statutory scheme requiring the defendant to come forward with evidence of the exception. See id. Finding this reasoning convincing, we hold that § 844(a)'s "unless" clause creates an exception for an accused to invoke by producing prima facie evidence of a valid prescription, not an element of the offense for a prosecutor to prove.

Unfortunately for Matthews, he cannot escape this conclusion with the cases he champions. True, one of his cases says that "[i]t is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception." United States v. Vuitch, 402 U.S. 62, 70 (1961) (emphasis added). But Vuitch's "general guide" is helpful only when Congress has not clearly expressed its intent. See United States v. Steele, 147 F.3d 1316, 1319 (11th Cir. 1998). And here Congress has spoken with crystal clarity, declaring in § 885(a)(1) that a defendant seeking the benefit of an exception found in title 21 must shoulder the burden of coming forward with evidence regarding that exception. So Vuitch's general rule does not come into play. See Steele, 147 F.3d at 1319. As for his other cases, they simply mention § 844(a) without discussing § 885(a)'s effect on the crime's elements or on the burdens of production. See Dorszanski v. United States, 418 U.S. 424, 426 n.3 (1974); United States v.

-11-

LaBuff, 101 F. App'x 678, 682 (9th Cir. 2004) (mem.); United States v. Stone, 139 F.3d 822, 834 (11th Cir. 1998); United States v. Swiderski, 548 F.2d 445, 449 (2d Cir. 1977). And that means that they cannot turn the tide in Matthews's favor.

Having concluded that § 844(a)'s "unless" clause creates an exception under § 885(a)(1), we find that the district court rightly denied Matthews a judgment of acquittal.

Sentencing Enhancement

Which takes us to the sentencing-enhancement issue. The government, naturally, bears the burden of proving sentencing enhancements. See, e.g., United States v. Paneto, 661 F.3d 709, 715 (1st Cir. 2011); Cannon, 589 F.3d at 517. The standard of proof is preponderance of the evidence. See, e.g., Paneto, 661 F.3d at 715; Cannon, 589 F.3d at 517. Either direct or circumstantial evidence will do, with the sentencing court free to draw commonsense inferences from the evidence. See, e.g., Paneto, 661 F.3d at 716; Cannon, 589 F.3d at 517.

For our part, we review the district court's legal rulings anew, its factfinding for clear error, and its application of the guidelines to the case on a "sliding scale" — with the scrutiny cranked up the more law-driven the court's decision is. See, e.g., United States v. Zehrung, 714 F.3d 628, 631 (1st Cir. 2013) (citing Cannon, 589 F.3d at 516-17). Of course, clear error is not an easy thing to show, because the sentencing court's choice

among rational but competing inferences cannot be clearly erroneous. See, e.g., Cannon, 589 F.3d at 517.

As relevant here, § 2K2.1(b)(6)(B) calls for a four-level sentencing enhancement if the defendant "possessed any firearm . . . in connection with another felony offense." The enhancement applies, then, if the court finds that the government proved two things by a preponderance of the evidence: one, that the defendant committed "another felony offense" — meaning "any Federal . . . offense punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained," USSG § 2K2.1 cmt. n. 14(C); and two, that he possessed a firearm "in connection with" that other offense — a phrase read broadly under our caselaw, which neither requires "actual use of the weapon during commission of the felony [n]or physical proximity between the weapon and the contraband." See Paneto, 661 F.3d at 716.

Taking the evidence in its totality (a macro approach, not a piece-by-piece micro one), we see enough here to support the district court's finding that Matthews committed "another felony" — namely, felony drug trafficking. See Cannon, 589 F.3d at 519 (indicating that felony drug trafficking is a qualifying felony under § 2K2.1(b)(6)(B)). Matthews already had a felony drug-trafficking conviction under his belt before getting busted in our case. Also, after moving from New York to Maine, he chose at some

-13-

point to pal around with another drug trafficker, McFadden, living with him for a time and getting pulled over with him in a traffic stop.[7]  More, Matthews sold Weeks crack in the past — the very drug she was "supposed to" get for helping the gun buy go down.  More still, despite having no job, he had thousands of dollars in cash on him when stopped by law enforcement.  On top of that, he had gotten Weeks to buy the pistol for him and had 3.2 grams of marijuana on him, with the gun inches from him when nabbed.

As the district court noted, Matthews's case bears an uncanny resemblance to Cannon.  There, we upheld a § 2K2.1(b)(6) sentencing enhancement, highlighting the following:  Cannon had a "history" as a drug trafficker — just like Matthews — suggesting that he was "no idle passenger" when the police collared him and his cohorts after a traffic-violation investigation found him armed and sitting in an SUV near an "unknown" amount of drugs.  Cannon, 589 F.3d at 516, 519 (discussing cases holding that a defendant's drug-trafficking history supports an inference that he is a drug trafficker).  Calling the combined $2,000 found on Cannon and the others (all of whom were unemployed) a "large" stash of cash — remember, a jobless Matthews had over $5,000 on him, if you add everything up, with most of it hidden in his sock — we said such an

_____

[7] The district court knew McFadden fairly well, having sentenced him to 33 months in prison for selling crack — a sentence the court handed down about a year after the police had found McFadden and Matthews together in the traffic stop and a few weeks before sentencing Matthews.

amount helps justify an inference that the SUV riders "were engaged in the sale, rather than the casual use, of drugs."  Id. at 518 (citing cases to back up that point).  Also, Cannon's having a gun on him with drugs in the SUV — Matthews had drugs on him with a gun next to him — was "probative of an intent to distribute narcotics," we wrote.  Id. (citing cases holding that guns and drug dealing go together like a hand in glove).  And on that record, we could not say that the sentencing court clearly erred in finding that Cannon was engaged in drug trafficking.  Id. at 518-19.  Given the eerie similarities between Cannon's case and Matthews's, we reach the same conclusion here.[8]

The push-back we get from Matthews is simply not persuasive.  He argues, for example, that given the small amount of marijuana on him, it is "equally plausible" to characterize the evidence as suggesting that he possessed drugs for personal use rather than for trafficking.  And, he adds, statements in the presentence report that he drew tattoos on others as an unlicensed tattoo artist "explains" why he had so much cash with him, casting doubt on any suggestion that he had gotten the money by trafficking drugs.  We see two big problems with this:  Matthews is essentially

_____

[8] Because we find that the district court supportably found that Matthews had engaged in felony drug trafficking, we need not reach the government's alternative theory that having a gun in connection with simple drug possession suffices to trigger a § 2K2.1(b)(6) enhancement — an issue, by the way, left open in our previous cases.  See Paneto, 661 F.3d at 716 n.5 (citing Cannon, 589 F.3d at 520 n.4).

-15-

asking us to view the evidence in stark isolation, which we cannot do. See id. at 519 (talking about our viewing the "totality of the evidence before the district court").  Also, and as we said moments ago, a sentencing court's selection of one plausible inference over another cannot be clearly erroneous.  See, e.g., Cannon, 589 F.3d at 517.  So, again, the district court's drug-dealing finding stands.

Moving on, we also see enough here to support the court's finding that Matthews possessed a firearm "in connection" with the discerned drug-dealing offense.  The quoted phrase requires that the gun's presence at the crime scene be more than coincidental. See Paneto, 661 F.3d at 716.  In other words, the gun must "'somehow aid[] or facilitate[], or ha[ve] the potential to aid or facilitate, the commission of another offense.'"  See id. at 717 (quoting United States v. Thompson, 32 F.3d 1, 6 (1st Cir. 1994)). But bear in mind (and at the risk of repeating ourselves): Matthews was no ordinary gun owner.  He had a prior felony that made it illegal — and thus particularly risky — for him to possess the pistol in question.  And he bought the pistol through straw-buyer Weeks, who explained that she had been promised crack for her troubles.  Also and again, Matthews consorted with a known drug dealer and had lots of cash on him, including a large sum tucked in his sock when agents caught him with the gun.  Ultimately, our view of the entire picture renders reasonable the inference — which the

-16-

district court made — that Matthews "wanted" the pistol (and not just his socks!) "to protect the cash and the drugs from people who would make off with it." Clearly, then, the pistol had the potential to facilitate the drug-trafficking offense "by emboldening the enterprise, aiding the collection of a drug debt, or in any number of foreseeable ways." See Cannon, 589 F.3d at 519.

Wait a minute, protests Matthews, the pistol was on Weeks's lap, "unloaded and locked." No doubt. But if a drug dealer who has an unloaded gun locked inside a safe in a room away from the drugs can possess the weapon in connection with another felony offense, see Paneto, 661 F.3d at 716, then surely it cannot be reversible error for the district court here to find that Matthews possessed the pistol in connection with his drug trafficking. After all, if everything had happened as planned, Matthews "would have had the Taurus, because he paid for it, and he would have had actual possession of the Taurus, because that was the purpose of the sale," the court supportably found. Also, unloaded pistols can be reloaded, and even unloaded guns can "facilitate drug trafficking," we have held. Id. at 718.

Bottom line: given the deferential standard of review at play here, we are duty-bound to uphold the four-level sentencing enhancement.

-17-

## FINAL WORDS

Our review done, we <u>affirm</u> Matthews's conviction and sentence.

<u>So ordered</u>.