# United States Court of Appeals
## For the First Circuit

No. 23-1515

UNITED STATES,

Appellee,

v.

EDWIN OTERO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Gelpí, Thompson, and Kayatta,
Circuit Judges.

Darla J. Mondou for appellant.

Alexia R. De Vincentis, Assistant United States Attorney,
with whom Leah B. Foley, United States Attorney, was on brief, for
appellee.

September 18, 2025

**THOMPSON**, **Circuit Judge**.  Edwin Otero was a violent (putting it mildly) Cape Cod-based drug dealer who now faces 456 months behind bars.  Today's appeal is about why Otero thinks that number is just too much.  After reviewing Otero's challenges to both the procedural and substantive reasonableness of his sentence, we think the district court's judgment is just right and far from a discretionary abuse.

## I

We begin with a brief recitation of the events that led to this appeal, along with some information about what happened at the district court.  Because our review follows Otero's guilty plea, "we draw the facts from the plea colloquy, the unchallenged portions of the presentence investigation report [(PSR)], . . . the transcript of the sentencing hearing and the parties' sentencing memoranda and exhibits."  United States v. Lilly, 65 F.4th 38, 39 (1st Cir. 2023) (alteration in original) (citation modified).

## A

For years Otero made a name for himself across Cape Cod, Massachusetts, and Rhode Island as a significant heroin dealer with a propensity for violence.  Through the rumblings of confidential sources, the Drug Enforcement Administration ("DEA") learned of Otero and kicked off an investigation into his operation in August 2018.  Months later, first in March 2019 and then in

April 2019, DEA agents obtained authorization to intercept communications from two of Otero's cell phones. Through their monitoring, the agents learned that Otero was the leader of a drug trafficking organization involving at least ten individuals and that he was slinging product almost every day. All told, the investigation uncovered a conspiracy to distribute and possess with intent to distribute over 100 grams of heroin between March 2019 and May 20, 2019 (the date of Otero's arrest).

Before discussing what happened after Otero's arrest, we need to take a step back and recap two of Otero's criminal endeavors that occurred while authorities had their eyes on him; we start with the grisly events that unfolded on the night of April 9, 2019, and into the early hours of the following morning. Otero thought he had a rat within his ranks and decided that he needed to not only punish this alleged rat but also make clear to his posse that (as the saying goes) "snitches get stitches."[1] So, Otero lured his victim to Pawtucket, Rhode Island, with promises of a boys' night and paid $186 for his victim's ride in from Cape Cod. Once the victim arrived at Otero's Pawtucket apartment, Otero and his cronies held the victim captive and began their brutal assault.

---

[1] This common euphemistic phrase originating in gang culture means that anyone who informs on others to authority, such as the police, will face revenge or physical violence so severe as to require medical stitches to close the wounds.

Otero initiated the onslaught by punching, kicking, and bludgeoning the victim with a sledgehammer. The rest of Otero's crew soon jumped in, repeatedly striking and stomping on the victim's head and body. During the assault (which lasted over eighteen minutes), Otero instructed his crew to strip the victim naked, directions that they dutifully followed. Otero said that he was going to rape the victim, and the assailants forced the victim onto his stomach. Otero made the victim -- now bloodied, naked, and disoriented -- kiss his feet and call him daddy.[2]

Otero intentionally recorded the just-described April 2019 kidnapping on video and, until his arrest, flaunted it to others while promising equal treatment for anyone else who cooperated with authorities against him. One individual whom Otero showed the video to later testified at a co-conspirator's trial and described an unrecovered portion of the video as "what looked like [Otero] was trying to put the hammer in [the victim's] butt." While that witness said she could not tell if Otero's efforts were successful, Otero's commentary while he displayed the video assured her that he had stuck the hammer into the victim's backside. Authorities also intercepted a call shortly after the

_____

[2] For the sake of completeness (or perhaps the lack thereof), the recovered video evidence and appellate record do not conclusively inform us when, why, or how the victim's torment ended.

attack where Otero bragged that he had raped the victim and got it on camera.[3]

The other event relevant to issues pressed in today's appeal occurred a month after the kidnapping, when Otero found himself involved in a separate altercation over a drug debt. That debt reached its boiling point on May 8, 2019, when Otero (drug creditor) tackled Krymeii Fray (drug debtor) outside of Fray's house and ordered one of his crew members to shoot Fray while they wrestled on the ground. Otero's crew member obeyed and fired a shot at Frey but missed. The following day, Otero bragged to a friend that he "shot the whole place" and "went crazy last night" despite not having fired any gun himself. Soon after, law enforcement finally put an end to Otero's criminal escapades when he was arrested on May 20, 2019.

**B**

After initially maintaining his innocence, Otero pleaded guilty without a plea agreement to eight charges connected to his drug dealing, drug possession, kidnapping, and possession of a firearm.[4] The district court accepted Otero's guilty plea and

---

[3] The victim did not recall being raped, nor many of the details surrounding his kidnapping and brutal beating.

[4] The charges were part of an eleven-count superseding indictment involving thirteen co-defendants. Otero was originally charged in nine counts (Counts One, Two, Four, Five, and Seven through Eleven); however, at the government's request the court dismissed Count 7 on January 17, 2023. The eight counts to which Otero pleaded guilty were: Count 1, conspiracy to distribute 100

informed him that a presentence investigation report would be prepared to help the court determine his sentence. Once completed, that report applied the United States Sentencing Guidelines (the "Guidelines") and computed a total offense level of 43 -- a culmination of four separate sentencing enhancements and a deduction for Otero's acceptance of responsibility.[5] This offense

---

grams or more of heroin in violation of 21 U.S.C. §§ 846 and 841(a)(1); Count 2, distribution of heroin in violation of 21 U.S.C. § 841(a)(1); Count 4, possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2; Count 5, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(iii); Count 8, being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); Count 9, conspiracy to commit kidnapping in violation of 18 U.S.C. § 1201(c); Count 10, conspiracy to obstruct justice by retaliation in violation of 18 U.S.C. § 1513(f); and Count 11, obstructing justice by tampering with a witness by physical force or threat in violation of 18 U.S.C. § 1512(a)(2)(C) and 18 U.S.C. § 2.

[5] Here's the math. Otero started at a base offense level of 32 for his conspiracy to commit kidnapping. See U.S.S.G. § 2X1.1(a); id. § 2A4.1(a). The kidnapping count was chosen because it yielded the highest offense level relative to Otero's other offenses. See id. § 3D1.3(a). From the base offense level of 32, two levels were added because the victim sustained serious bodily injuries. Id. § 2A4.1(b)(2)(B). From the updated offense level of 34, another two levels were added because Otero used dangerous weapons. Id. § 2A4.1(b)(3). From the updated offense level of 36, another six levels were added because the victim was sexually exploited (much more on this enhancement later). Id. § 2A4.1(b)(5). From the updated offense level of 42, another four levels were added because Otero was the organizer or leader of the criminal activity. Id. § 3B1.1(a). Since Otero accepted responsibility (he pleaded guilty), the offense level was reduced by two levels from 46 down to 44. Id. § 3E1.1(a). And in the end, Otero received a total offense level of 43 because that is as high as the sentencing table goes. U.S.S.G. ch.5, pt. A, cmt. n.2.

level, along with a criminal history category of III and a lack of mitigating factors, produced a "guideline imprisonment range [of] life." See U.S.S.G. ch. 5, pt. A, cmt. n.2. In their respective sentencing memorandums, Otero sought a sentence of 180 months' imprisonment, while the government recommended 480 months as an appropriate sentence.

When it came time for Otero's sentencing hearing, the court first acknowledged and heard argument on Otero's objection to the application of a six-level sexual exploitation enhancement to his total offense level (we'll get into the basis for his objection momentarily). However, the court remained convinced that the evidence presented by the government was sufficient to support this enhancement, and it rejected Otero's objection.[6]

From there, the court walked through the Guidelines calculation outlined in the presentence investigation report. The

---

[6] Otero's sentencing hearing took place after some of his co-defendants were already charged and sentenced for the April 2019 kidnapping. Those co-defendants who came before Otero also received six-level sentencing enhancements for the sexual exploitation of the kidnapping victim. So, having "already ruled" on this enhancement, the district court did not precisely set out the facts proven by a preponderance of the evidence to support the enhancement in Otero's case. Nevertheless, in an earlier sentencing hearing (at the request of counsel for a co-defendant), the court stated that the government had "satisfied by a preponderance of the evidence . . . that the rape actually took place and . . . the way that Mr. Otero used the threats during that assault and the purposes for it all make out sexual exploitation." In considering this prior explanation from a co-defendant's sentencing hearing, we note that Otero has not argued we should disregard these specific findings.

court remarked that Otero's sentencing enhancements resulted in him "exceed[ing] the grid" and then concluded that the Guidelines range for Otero was "life plus ten years with a minimum mandatory of at least 15 years."[7] With a Guidelines range established, the court tethered its analysis to the particulars of Otero's offenses and circumstances. It first explained that Otero "ha[d] shown an incredible callousness and disregard" for other people through his violent acts and drug dealing. And while the court acknowledged the fact that Otero had made efforts to better himself while incarcerated, it explained that its sentencing decision looked beyond giving Otero time to rehabilitate himself. An appropriate sentence for Otero, the court expounded, needed to also punish him, deter others, and "protect the world from someone like him who is willing to use violence in the way that he used it, which was to further his own economic and personal goals."

With all information at hand and rationale explained, the court sentenced Otero to a total term of 456 months' imprisonment -- 336 months served concurrently for all counts and 120 months added on for Count 5 to be served consecutively.[8] Once

---

[7] While the sentencing table stops at "life," the district court clarified that Otero faced a minimum sentence of fifteen years -- five years on the drug count and then ten years for the use of a firearm in furtherance of the drug count -- and that the ten years for Count 5 would be added "on and after any other sentence" technically including a life sentence.

[8] Another brief pause to explain how seven of the eight counts Otero pleaded guilty to fit into this 336-month sentence. Counts

- 8 -

the court announced its decision, Otero objected to the sentence's substantive reasonableness seeking to preserve the issue for appellate review. The court swiftly rejected Otero's objection and informed him that the sentence was below the Guidelines sentencing range and that there was "no circumstance under which [the court] would sentence [Otero] to less than [456 months]." Otero's timely appeal followed.

## II

Otero's two appellate asseverations contest his sentence as procedurally inept and substantively unreasonable. In reviewing claims of sentencing error, "we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable." United States v. Carrasquillo-Vilches, 33 F.4th 36, 41 (1st Cir. 2022) (quoting United States v. Clogston, 662 F.3d 588, 590 (1st Cir. 2011)). Having objected to the enhancement and the length of his sentence, Otero has preserved both his procedural and substantive challenges, so we review the sentence for abuse of discretion. See id. "Within the abuse-of-discretion rubric, 'we review the

_____

2, 4, 10, and 11 all have maximum sentences of 20 years (or 240 months); Count 8 has a maximum sentence of 10 years (or 120 months); Count 1 has a maximum sentence of 40 years (or 480 months); and Count 9 (the kidnapping count used for calculating the Guidelines range) has a maximum sentence of life imprisonment. So, Otero's sentence is the maximum for Counts 2, 4, 8, 10, and 11 served concurrently with a below maximum sentence for Counts 1 and 9 -- 336 months.

sentencing court's findings of fact for clear error and questions of law (including the court's interpretation and application of the sentencing guidelines) de novo.'" Id. (quoting United States v. Rivera-Morales, 961 F.3d 1, 15 (1st Cir. 2020)).

## A

Otero begins his procedural argument by asserting that the district court misapplied the six-level sexual exploitation enhancement under U.S.S.G. § 2A4.1(b)(5). Here's why we see things differently.

The government bears the burden of proving the requirements of sentencing enhancements by a preponderance of the evidence. United States v. Matthews, 749 F.3d 99, 105 (1st Cir. 2014). As relevant here, the Guidelines require a six-level increase in a defendant's total offense level for kidnapping offenses where "the victim was sexually exploited." U.S.S.G. § 2A4.1(b)(5). The enhancement applies, then, if the government proves by a preponderance of the evidence that a kidnapping victim was in fact "sexually exploited" -- a term that the application notes of the Guidelines define to "include[] offenses set forth in 18 U.S.C. §§ 2241-2244, 2251, and 2421-2423." U.S.S.G. § 2A4.1(b)(5) cmt. 3. To prove this element of the enhancement, "[e]ither direct or circumstantial evidence will do, with the sentencing court free to draw commonsense inferences from the evidence." See Matthews, 749 F.3d at 105.

Otero (somewhat oddly we must say) would have us pull our definition of "sexually exploited" exclusively from 18 U.S.C. § 2251(e) and our recent caselaw interpreting that statutory provision (which, to Otero's credit, does examine the meaning and history of "sexual exploitation," at least in one context). See United States v. Winczuk, 67 F.4th 11, 14 (1st Cir. 2023) ("The sole question presented in this appeal concerns the interpretation of the phrase 'relating to the sexual exploitation of children' in § 2251(e)."). In Winczuk, we looked to external sources (including Black's Law Dictionary) to aid our interpretation of § 2251(e) because the statute "d[id] not expressly define ['sexual exploitation of children']." Winczuk, 67 F.4th at 16 (second alteration in original) (quoting Esquivel-Quintana v. Sessions, 581 U.S. 385, 391 (2017)). Otero argues the definition of sexual exploitation lifted from Winczuk and constructed, in part, using external interpretive aids should apply to his sentencing enhancement, and if we did so, we would conclude that the district court erred in applying a sexual exploitation enhancement.

Otero's argument has a cannonball-sized flaw in it (as the government readily points out). Winczuk and its interpretation of § 2251(e) has no direct bearing on the meaning of "sexually exploited" as applied in Otero's sentencing because Otero's victim was not a minor and the Guidelines themselves provide their own

definition tied to multiple statutory provisions beyond § 2251(e).[9] As a result, the Guidelines' definition intentionally covers a broader range of conduct than the Winczuk interpretation specifically addressing "any criminal sexual conduct involving children." 67 F.4th at 18. For example, 18 U.S.C. § 2241 (a statute included in the Guidelines' definition of "sexually exploited") prohibits the use of force to cause or attempt to cause another person to engage in a "sexual act" -- defined elsewhere to include "the penetration, however slight, of the anal . . . opening of another . . . by any object, with an intent to abuse, humiliate, harass, [or] degrade" any person, id. § 2246(2)(C). Likewise, the offense set forth in 18 U.S.C. § 2244 (another statutory provision identified by the Guidelines) prohibits "sexual contact" defined to include "the intentional touching, either directly or through the clothing, of the . . . buttocks of any person with an intent to abuse, humiliate, harass, [or] degrade" any person, id. § 2246(3).

---

[9] Otero briefly seemed to argue in his opening brief that the sexual exploitation enhancement could only be applied to offenses involving a minor. However, Otero clarified his position in his reply brief and agrees with the government that U.S.S.G. § 2A4.1(b)(5) is not limited to sexual exploitation of a minor. We agree with Otero's clarification and proceed with this consensus among the parties in mind.

Therefore, Otero's proposed definition for "sexually exploited" is simply one piece of a much larger puzzle, and again, a piece not relevant to our analysis here.[10]

With the appropriate definition for "sexually exploited" in place, we need not travel far to see that we have enough evidence to support the district court's finding that Otero sexually exploited his victim. We'll recap it anew. After initiating the assault, Otero ordered the victim be stripped naked. Once the victim had been stripped, Otero and his accomplices forced the victim onto his stomach. Otero said that he was going to rape the victim during the assault. Otero concedes to touching the victim's naked buttocks with the sledgehammer, and, during the assault, Otero ordered his bloodied and naked victim to kiss his feet and call him daddy.[11]

More still, authorities intercepted calls after the assault where Otero bragged that he raped the victim and got it on camera. A witness testified at a co-defendant's trial that Otero

---

[10] Because Otero's argument focuses on one of several statutory provisions included in the Guidelines' definition, he has not asked us to reject the Guidelines' definition of "sexually exploited." Cf. United States v. Gadson, 77 F.4th 16, 20 (1st Cir. 2023). Our disagreement with Otero lies only in which statutory provision cited in the Guidelines' definition ought to apply to his conduct.

[11] The recovered video footage further corroborates the district court's factual findings, as well as its application of the Guidelines enhancement.

- 13 -

showed her a video of the attack and, as the video played, Otero said "[l]ook, we're trying to shove the hammer up his butt." That same witness also testified that when she saw a video of the attack (a segment that was not entered into evidence and apparently deleted by the time authorities seized Otero's phone) it "looked like [Otero] was trying to put the hammer in [the victim's] butt. Whether he actually did or not, I couldn't tell." Nevertheless, Otero told the witness that he was successful in his efforts. In light of this evidence, we cannot conclude that the district court erred in finding by a preponderance of the evidence that Otero sexually exploited his victim.

Further, in reaching that conclusion, we are also unpersuaded by a couple of additional arguments Otero pushes. He contends that we should discount his post-attack admission to raping the victim because he is a "prolific boaster" and therefore his statement does not have the "sufficient indicia of reliability to support its probable accuracy." To bolster that argument, Otero reminds us that after the Fray shooting, he falsely bragged that *he* shot up Fray's house -- demonstrative proof that his words cannot be trusted. However, considering the rest of the evidence we've already described (and would prefer not to describe again), we cannot say that the district court's conclusion that Otero did what he said he did was an impermissible interpretation of the evidence. See Matthews, 749 F.3d at 106 ("[A] sentencing court's

selection of one plausible inference over another cannot be clearly erroneous."); see also United States v. Messer, 71 F.4th 452, 460 (6th Cir. 2023) (affirming a district court's finding that a victim was sexually exploited as a permissible view of the evidence).

Otero also argues (unconvincingly) that based on the evidence, "[i]t cannot be said with assurance what appeared . . . to be rape was, in fact rape." Otero points out that the government's witness only testified that it "looked like he was trying to put the hammer in his butt" and that this doesn't prove he did so. This argument first misses the mark because the standard is not "assurance" but rather (as we've already mentioned) a preponderance of the evidence. See, e.g., United States v. O'Brien, 560 U.S. 218, 224 (2010). Under this standard, Otero's demand that the government produce some kind of smoking gun -- i.e., the missing video segment of the assault or something else -- "essentially ask[s] us to view the evidence in stark isolation, which we cannot do." Matthews, 749 F.3d at 106. This witness's testimony describing what appeared to be a rape in conjunction with Otero's corroborative admissions and the still extant recovered video footage supports the district court's determination.

In a last-ditch effort, Otero pushes back on the government's description of his admission to touching the victim's naked buttocks with a sledgehammer as an admission of "sexual

contact." Otero argues that the government's brief nefariously omitted an important part of the statutory definition for "sexual contact" that requires the touching be done "with an intent to abuse, humiliate, harass, degrade, *or arouse or gratify the sexual desire of any person*." 18 U.S.C. § 2246(3) (Otero's emphasis). Thus, according to Otero, one of the statutes relied upon by the government requires proof that Otero's admitted touching of the victim be sexually motivated or with a sexual intent. He claims his touching of the victim "exhibit[ed] an intent to be cruel, abusive and demeaning but not in a sexual manner."

We reject Otero's argument that his behavior does not constitute sexual exploitation even if his admitted to touching of the victim was not (as he puts it) "sexually motivated." Otero's actions were undisputably taken with the intent to abuse, humiliate, harass, or degrade his victim. See United States v. Demarrias, 876 F.2d 674, 676 (8th Cir. 1989) (explaining the purpose of the statutory intent requirement and defining that intent be "to gratify, harass, abuse, or degrade"). As Otero says, he considered "the victim a 'rat' who needed to be punished." And like before, Otero's attempt to describe his conduct as a mere beating where his victim happened to be naked and where one of his sledgehammer blows incidentally touched the victim's buttocks ignores the remaining evidence available for the district court's consideration. To be clear, Otero's admission to touching his

victim's naked buttocks is not our only basis for determining the district court did not err in finding sexual exploitation. Rather, Otero's admitting to touching, along with the accompanying body of evidence (such as the command to strip the victim naked and force him onto his stomach, the direct threat of rape, forcing the victim to kiss his feet and call him daddy, the filming of it all, and boasting about the rape in the aftermath; just to list a few examples), together supports the district court's finding. See Matthews, 749 F.3d at 105 (describing our review of the evidence as "a macro approach, not a piece-by-piece micro [approach]").

Summing up and taking all the evidence in its totality, we do not have a "strong, unyielding belief" that the district court made a mistake in finding it was "more likely true than not" that Otero raped his victim and that there were sexual overtones to the whole assault, either of which are sufficient to support the enhancement. Lilly, 65 F.4th at 41 (describing the clear error standard); United States v. Dávila-Bonilla, 968 F.3d 1, 5 n.5 (1st Cir. 2020) (describing the preponderance of the evidence standard). So, the district court's finding stands.[12]

---

[12] Because we find no error in the court's application of the six-level sentencing enhancement, we decline to engage in the parties' arguments that any supposed error was harmless. See generally Fawcett v. Citizens Bank, N.A., 919 F.3d 133, 140 (1st Cir. 2019) ("When 'it is not necessary to decide more, it is necessary not to decide more.'" (quoting PDK Labs. Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004))).

- 17 -

Otero next takes aim at the substantive reasonableness of his sentence. When we review the substantive reasonableness of a sentence, we're essentially making sure that the sentencing judge didn't act too harshly given the totality of the circumstances. United States v. Fargas-Reyes, 125 F.4th 264, 278 (1st Cir. 2025). We will find that "[a] sentence is substantively reasonable so long as the sentencing court has provided a plausible sentencing rationale and reached a defensible result." United States v. Turner, 124 F.4th 69, 82 (1st Cir. 2024) (citation modified). And among the universe of defensible results, a within-Guidelines sentence will almost always be defensible. United States v. De Jesús-Torres, 64 F.4th 33, 42 (1st Cir. 2023); see also United States v. Colcord, 90 F.4th 25, 30 (1st Cir. 2024).

From what we can tell, Otero's half-baked arguments as to the substantive reasonableness of his sentence can be broken into two parts: His sentence is substantively unreasonable when the improperly applied six-level enhancement is removed and his sentence is higher than this circuit's average sentence for kidnapping offenses in 2018. Neither contention gets him very far.

As we've already explained, the district court did not err in applying the six-level sentencing enhancement. And even if the sexual exploitation enhancement were removed, Otero's reduced

total offense level would be 38 (i.e., six levels below his original off-the-grid offense level of 44), resulting in a Guidelines range of 292 to 365 months.  See U.S.S.G. ch.5, pt. A. Otero's 336-month sentence (concurrent for all counts except Count 5) therefore falls within the Guidelines range whichever way we slice it and remains a defensible outcome.  Otero's repeated refrain that his sentence is "not defensible" fails to convince us that his sentence falls "within the long-odds exception" to our general rule that "a within-[G]uidelines sentence [is] a defensible outcome."  De Jesús-Torres, 64 F.4th at 42.

For the final act of this appeal and in support of his substantive unreasonableness protestation, Otero sprinkles in some "statistical evidence" on the First Circuit's average sentence for kidnapping offenses in 2018.[13]  Otero argues that because the 2018 average was 189 months, his "almost double" sentence of 336 months must be "greater than necessary."  We disagree for a few reasons.

First, to challenge a sentence disparity, "the proponent [must] furnish the court with enough relevant information to permit a determination that he and his proposed comparators are similarly situated."  United States v. González-Rivera, 111 F.4th 150, 155

---

[13] Not that there is anything special or otherwise more supportive to Otero's argument about 2018.  The available First Circuit sentencing data for each year from 2019 to 2022 either had zero kidnapping convictions or too few to create any sort of usable sample size.  There were ten First Circuit kidnapping convictions in 2018.

(1st Cir. 2024) (quoting United States v. Rodríguez-Adorno, 852 F.3d 168, 177 (1st Cir. 2017)).  "That information must enable the court to compare apples to apples."  Id. (quoting Rodríguez-Adorno, 852 F.3d at 177).  Otero humbly concedes he never argued his "statistical evidence" was "apples to apples" with the facts of his case as required under González-Rivera.  Based on what we know about Otero, and the fact that we know nothing about the individuals convicted of kidnapping in 2018, the average sentence Otero has provided does not help his claim of substantive unreasonableness.  Cf. id. at 155-56.

Likewise, to the extent Otero argues his sentence is "greater than necessary," merely because it is "almost double" the 2018 average, he has failed to engage with all the reasons the district court gave for imposing a sentence it considered to be reasonable.  We have no roving prohibition on double-average sentences, and our requirements that the sentencing court provide a plausible rationale and reach a defensible result have been satisfied.  Therefore, Otero's sentence will remain.

**III**

For the reasons stated, Otero's sentence is **affirmed**.